[No. E049008. Fourth Dist., Div. Two. Feb. 8, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS GOMEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.C.

**COUNSEL**

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KING, J.—

## I.  INTRODUCTION

Defendant Carlos Gomez and three others assaulted Nicasio Estrada at an apartment complex where Estrada lived. During the attack, one of the assailants obtained the keys to Estrada's pickup truck. After beating Estrada, the four men left the apartment complex in defendant's car, then returned 10 or 20 minutes later. By that time, Estrada was inside his apartment. Two of the four assailants got into Estrada's truck and drove away.

Defendant was charged with carjacking (count 1; Pen. Code, § 215, subd. (a)),[1] robbery (count 2; § 211), assault with a deadly weapon (count 3; § 245, subd. (a)(1)), and active participation in a criminal street gang (count 4; § 186.22, subd. (a)). The People also alleged the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang under section 186.22, subdivision (b). The People further alleged defendant had one "strike" conviction (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)) and one prior serious felony (§ 667, subd. (a)).

A jury convicted defendant of the carjacking count, simple assault (a lesser included offense of assault with a deadly weapon), and active participation in a criminal street gang. He was acquitted of the robbery charge. The jury also found true the allegations that the carjacking and assault crimes were committed for the benefit of a criminal street gang. In a bifurcated trial, the court found true the allegations of the prior convictions. He was sentenced to a total term of 23 years in state prison.

Defendant contends: (1) The evidence was insufficient to establish either the intent or immediate presence elements of carjacking; (2) the court erred in allowing into evidence his statement made during a booking interview that he was a member of a gang; and (3) the court erred in denying his motion to bifurcate the gang enhancements and sever the gang participation count. We affirm the judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Prosecution Case*

Nicasio Estrada testified as follows. He was in charge of maintenance at the apartments where he lived on Philbin Street in Riverside (the Philbin

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

apartments). At approximately 1:00 in the morning of May 28, 2007, he left his apartment to check the grounds of the apartment complex to see that windows and doors on unoccupied apartments were closed. He carried a flashlight. His wallet, money, and keys were in his pant and jacket pockets. His pickup truck was parked about 10 feet away from his apartment. As he was walking back toward his apartment, a white car coming from the street stopped approximately 25 to 40 feet from him. There were four or five people inside the car. Four men got out of the car and came up to him, "[v]ery close up and very aggressively." One of the men, identified later as Anthony Garcia, "came nose to nose" with Estrada. Defendant was the man farthest away from him—about four feet behind Garcia. The other two men were subsequently identified as Manuel Zamora (Manuel) and Raymond Zamora (Raymond).

According to Estrada, the men made "hand signs like gangsters would make." Garcia asked Estrada for his name and either (1) did he live there or (2) where he was from.[2] Estrada said he did live there and that they did not. Garcia then began hitting him. Estrada ran to a stairway. The men ran after him and knocked him down. All four of the men hit him with their fists all over his body. He got up to defend himself, but was knocked down again. At some point during the attack, defendant said to the others: " 'Finish him.' "

Defendant twice threw a concrete block or brick at Estrada. The first time, he hit Estrada on his hip or "thorax." The second time, he threw the block at Estrada's head. Although Estrada was able to partially deflect the block the second time, it brushed against his face under his right eye.

At some point, Raymond obtained the keys to Estrada's truck. As will be discussed below, there is evidence to support inferences that Raymond took the keys directly from Estrada during the attack, that he took Estrada's jacket during the attack and later found the keys in the jacket pocket, and that he found the keys on the ground as they were leaving.

According to Estrada, something "alerted" the attackers and they ran to their car and drove away. He went back to his apartment and called 911. Approximately 10 or 20 minutes after the attack, he saw the car with the men return. He watched them through a window from inside his apartment.

---

[2] Estrada, who speaks fluent Spanish and understands English, testified through an interpreter. He testified that Garcia spoke to him in English and asked him: "[D]id I live there." A police officer who responded to the 911 call regarding the attack and who speaks English and Spanish testified that Estrada told him that the attackers asked him in English: " 'Where are you from?' "

Manuel and Raymond got out of the car and walked toward his apartment. Defendant remained in or near the car. Estrada made eye contact with them. They tried to enter the apartment through the front door to (according to Estrada) "assault us inside." The Zamoras were not able to get in.[3] They then went to his truck. One of the Zamoras opened the truck with a key. They both then got into the truck and drove away.

Shortly after the attack, police found Estrada's truck on Calmhill Drive, approximately two miles from the Philbin apartments. A police officer testified that he saw four people "pulling stuff out of" the vehicle and tossing it to the ground. The four were detained. They were Garcia, Manuel, Raymond, and defendant. Police took Estrada to the location on Calmhill Drive where he identified the detainees as the people who attacked him.

Following defendant's booking at the Robert Presley Detention Center, he was interviewed by Mike Munoz, a sheriff's deputy and "classification officer." Deputy Munoz asked defendant his name, date of birth, and whether he had any gang affiliations. Defendant told Deputy Munoz his name, birth date, and that he was affiliated with Arlanza. Deputy Munoz then asked defendant if he was an active member, associate, or former member of the gang. Defendant told Deputy Munoz that he was an active member and used the moniker "Scooby." Deputy Munoz also took note of "Arlanza" and "Traviesos" tattoos on defendant's chest and stomach.

Riverside Police Detective James Simons testified as a gang expert. He testified that the Arlanza 13 gang is a Hispanic gang that claims a certain area in the City of Riverside, including John Bryant Park. The Philbin apartments are in the middle of Arlanza 13 territory. He stated that Traviesos is a clique, or subset, of Arlanza 13. The primary activities of the Arlanza 13 gang include narcotics violations, grand theft, weapons violations, and violent assaults against rival gang members. Detective Simons said he was familiar with Garcia and the Zamoras and that each had previously admitted membership in the Arlanza 13 gang.

Detective Simons opined that the attack on Estrada was committed for the benefit of, at the direction of, and in association with Arlanza 13. He explained that the "association" is shown by the fact that four gang members

---

[3] The attempt to get inside the apartment was described by Estrada on the prosecutor's redirect examination. Estrada did not mention this attempt in his initial, direct examination or on cross-examination. Indeed, he initially testified that the two assailants who took the car walked "directly" to his truck.

were committing the crime together. The crime was committed at the direction of Arlanza 13 because defendant told the "younger members to finish [Estrada] off." Finally, the crime benefits the gang because it occurred within the area claimed by Arlanza 13 and instills fear within the members of the community and, therefore, respect for the gang.

Detective Simons testified that a gang member who decides to disassociate himself from the gang "would have to move out of the area where this gang exists . . . ." Although it is possible to continue to live in Arlanza 13 territory and be "retired" from the gang, a member cannot "pick and choose" when to be in the gang. If you are with "fellow gang members and something happens where you're attacked by rival gang members, you're expected to jump in and fight those rival gang members with your fellow members. If you don't, then you can be assaulted yourself and get kicked out of the gang."

Detective Simons opined that defendant was an active Arlanza 13 gang member on the date of the attack on Estrada. He based this opinion on defendant's admissions of gang membership to police officers in 1994 and 2005, defendant's arrest for possession of narcotics in 2003 while in the presence of another gang member, defendant's arrest in 1994 for injuring a rival gang member in the company of two other gang members, defendant's gang tattoos, and "most importantly, his ongoing association with Arlanza gang members and his ongoing active participation in the types of crimes that they commit, which was involved in this case."[4]

## B. *Defense Case*

In his defense, defendant offered testimony by his former parole officer, a former supervisor where defendant worked, his mother, his girlfriend, a witness to the attack, and himself. His parole officer from July 2005 until May 2007 testified that he never saw any evidence that defendant was involved in gang activity. The supervisor testified that defendant worked for a ceramic tile manufacturer from 2005 until his arrest in 2007, never had any problems at work, and always showed up on time.

Defendant's mother testified defendant lived with her after he was paroled in 2005. She said that defendant had turned over a new leaf and got a job. He had a girlfriend who moved in with them, and he fathered a child. She did not see him hang out with gangs. Rather, he worked and spent time with his

---

[4] After defense counsel drew attention to the fact that Detective Simons mentioned no evidence of defendant's gang activity between 1994 and 2003 or between 2005 and 2007, the prosecution, on redirect, elicited from Detective Simons that defendant had been incarcerated from 1994 until 2001 and again from 2003 until 2005.

family. Defendant's girlfriend testified she was with defendant every night for the two years prior to his arrest and never saw defendant hanging out with gang members.

Rafial Simon testified he was with his brother at the Philbin apartments at the time of the incident. He saw four Hispanic males walk into the apartment complex and approach the apartment maintenance man. He did not hear the initial exchange between them, but then heard the men hollering at the maintenance man, asking, "What are you doing?" and "Why are you looking in these cars?" He did not hear any references to a gang or anything to identify the men as gang members. When the men began hitting the maintenance man, Simon started to intervene. However, when the largest of the men started toward him and said something like, "you want a piece of me too," Simon retreated to his brother's apartment. From inside, he could see the two youngest of the four men punching the maintenance man; someone was yelling, "Get him. Kick his ass." At some point, the maintenance man got up and walked to a place out of Simon's sight. For about three minutes, Simon could not see what transpired. He did not see anyone throw a brick at the maintenance man. He subsequently peeked out his window and, as the attackers were leaving, saw one of them pick something up and say to the others, "hey, look." Simon said "it could have been the guy's wallet." He did not see the attackers return and take a truck.

Defendant testified as follows. He was a member of Arlanza 13 by the time he was 16 years old in 1994. He was in the California Youth Authority and then prison from 1994 to 2001. He was incarcerated a second time from 2003 until 2005 for a drug-related conviction, which he said was not gang related. He acquired his gang tattoos in 2003 while in prison. After being paroled in 2005, he turned over a new leaf and got a job. He was no longer hanging out with gang members and did not consider himself a gang member.

On the night of the attack on Estrada, he had a disagreement with his girlfriend and went out. After going first to his aunt's house, he drove to John Bryant Park in the "old neighborhood" between 11:00 p.m. and 11:30 p.m. He went alone, with an 18 pack of beer. He decided to go to that park because he knew it was an Arlanza 13 park and he would feel comfortable there. There, he met the Zamoras and Garcia.

He first met Manuel in 2002 and knew he "had ties" with and was "related to Arlanza 13," but did not know he was a gang member. He did not know Raymond or Garcia. At the park, they drank beers for approximately one-half hour; they did not talk of Arlanza 13 or gangs. Raymond said he wanted to go visit someone at the Philbin apartments. Defendant drove them to the complex. There was no plan to beat someone or take anyone's car.

When they arrived at the Philbin apartments, the Zamoras and Garcia got out first. As defendant was locking the car, he saw the others get into a "scuffle." The fight started in the driveway, then moved to the steps by one of the apartment buildings. He ran to the fight to help the Zamoras and Garcia; everyone was hitting everyone. When Estrada grabbed defendant's shirt, defendant asked him to let go. When Estrada did not let go, defendant hit him twice. He denied picking up or throwing a brick at Estrada, and said he never told anyone to "[g]et him," "[k]ick his ass," or "[f]inish him."

After hitting Estrada, defendant ran back to his car, followed by the others. He did not know that anyone had taken anything from Estrada. After they drove away, Raymond said, "hey, I got his car keys." Raymond told defendant to go back to the apartments. Although it was not his intention to take Estrada's truck, he knew Raymond planned to take the truck and knew he was helping others commit a crime. When they returned, Raymond and Garcia got out of his car and into Estrada's truck; defendant and Manuel stayed in his car. Defendant then followed the truck to Calmhill Drive. When the truck pulled over, he pulled in behind it. He watched as Garcia and Raymond went through the truck and threw items on the ground.

## III. ANALYSIS

### A. Sufficiency of the Evidence of Carjacking

Defendant contends the evidence is insufficient to convict him of carjacking for two reasons. First, there was no evidence defendant intended to deprive Estrada of his truck when he used force or fear against him; second, the evidence was insufficient to establish the truck was taken from Estrada's immediate presence. We reject both arguments.

Carjacking is defined as "the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." (§ 215, subd. (a).) The requisite intent—to deprive the possessor of possession—must exist before or during the use of force or fear. (§ 20; Judicial Council of Cal., Crim. Jury Instns., CALCRIM No. 1650; cf. *People v. Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262] [to "support a robbery conviction, the evidence must show that the requisite intent to steal arose either before or during the commission of the act of force"].)

When reviewing a challenge to the sufficiency of the evidence, an appellate court must view the record in the light most favorable to the judgment below

to determine whether it discloses substantial evidence to support the verdict. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) Substantial evidence is evidence that is of ponderable legal significance; reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson, supra*, at p. 576; *People v. Bassett* (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777].)

### 1. *Sufficiency of the Evidence of Intent*

Defendant's first argument—that the evidence is insufficient to establish that the intent to deprive Estrada of his truck existed at the same time as the use of force or fear—is based on the premise that the relevant use of force or fear was the physical assault on Estrada. According to defendant, there is no evidence that he or his associates had formed the intent to take Estrada's truck at any time during the time they were physically attacking him. In their brief, the People respond to this argument. As we explain below, defendant's argument has merit.

However, the prosecution's theory of carjacking at trial was based on a different premise. At trial, the prosecutor argued that the relevant force or fear for purposes of carjacking occurred after the assailants returned to the apartment complex and took Estrada's truck. At that point, the prosecutor argued, Estrada watched through his window and—having been beaten up by the same men just minutes earlier—was too frightened to stop them from taking his truck. The men thus placed Estrada in fear of further harm as they took his truck. Because the sufficiency of the evidence under this theory was not addressed in the parties' initial briefs, we requested supplemental briefs concerning the issue, which we have received and reviewed. We hold that the evidence is sufficient to support the conclusion that the attackers had the intent to take the truck upon their return to the Philbin apartments and they used fear against Estrada to accomplish the taking.

### (a) *The Argument Asserted in the Briefs*

A review of the entire record does not reveal an intent to take possession of Estrada's truck before or during the assault on Estrada. There is no evidence of any actions or statements made prior to the assault that suggest any intent to take Estrada's truck or any vehicle. When defendant and his cohorts entered the Philbin apartments, Estrada was walking through the grounds with a flashlight. His keys were in his pocket. His presence and behavior would not suggest to his assailants that he was on his way to or from any vehicle. According to Estrada, he was confronted by the four men and then

asked his name and whether he lived there or where he was from. Neither Estrada nor witness Simon testified that anyone ever made any kind of demand for, or expressed any interest in, Estrada's vehicle or keys. After a brief verbal exchange between Garcia and Estrada, unrelated to Estrada's vehicle, Garcia, then the others, began hitting Estrada.

At some point, Raymond obtained possession of Estrada's keys. However, it is not clear when or how this happened or when he realized he had the keys. On direct examination, the following colloquy between the prosecutor and Estrada took place:

"Q. Now, let me go back a little bit. You said you had a wallet and some money and your keys on you. Do you remember that?

"A. Yes.

"Q. Were they in your pant pocket?

"A. Pant and jacket pocket.

"Q. Okay. And did the four men take that away from you?

"A. Yes. And they tried to take my clothes off me.

"Q. When did they try to do that? Let me clarify. Was it when they first approached you they took your stuff from your pockets? Was it by the stairs, or was it by the second time that you fell when you were being hit with a block?

"A. The second action of falling.

"Q. So was it before or after the block that was thrown.

"A. Before the block.

"Q. And at the time that the items were taken from you, were you still on the ground?

"A. I'm trying to remember.

"Q. I know it's been some time. Take your time."

At this point, the court recessed. When the trial resumed, the prosecutor moved on to another area of inquiry.

The People rely on this testimony to show that Raymond took Estrada's keys from Estrada's pocket during the fight. Indeed, although the questions and responses are somewhat vague and ambiguous, the testimony would seem to permit an inference that the items in Estrada's pockets, including his keys, were taken from his pockets during the fight. Estrada said they *"tried"* to take his clothes off him, implying that they did not succeed in taking his jacket or other item of clothes. It follows that if the keys were taken but his clothes were not, the keys must have been taken directly from his pocket during the fight. In addition, the prosecutor asked Estrada when "they took your stuff from [his] pockets . . . ." If the assailants took his jacket and not the stuff from his pockets, we might expect Estrada to correct the prosecutor on this point.[5]

On cross-examination, Estrada testified as follows:

"Q. You described in prior testimony that they actually took your jacket?

"A. Yes.

"Q. And there were items, money and coins and your keys, inside your jacket?

"A. Yes.

"Q. And it was one of the Zamoras that took those items, that took your jacket?

"A. Yes."

This testimony tends to weaken the inferences from the earlier testimony that items were taken directly from his pockets and suggests that the keys were taken because the keys were in Estrada's jacket pocket and his jacket was taken. If so, this would explain Raymond's delay in informing the others that he had Estrada's keys—he did not go through the pockets until he was back in defendant's car.

Finally, witness Simon testified that one of the assailants appeared to pick something up off the ground as they were leaving and said, "hey, look." It is possible that what he picked up off the ground were Estrada's keys.

---

[5] The People also note that, on redirect, the prosecutor asked Estrada: "[A]fter you were attacked and the things were removed from your pockets, I believe you testified earlier today that the car came back a second time; correct?" Estrada answered, "Yes." Arguably, Estrada's "Yes" is an affirmation of every aspect of the prosecutor's question, including the reference to "the things . . . removed from your pockets." It is also reasonable to construe his response as merely affirming his prior testimony that the car came back a second time.

If the issue was simply whether the jury could reasonably conclude that Raymond took Estrada's keys from Estrada's pocket during the fight (and not from the jacket pocket after the fight), we would have to conclude that the testimony from Estrada's direct examination is sufficient to establish this fact. Based on this fact, the People then conclude that "there was substantial evidence that [defendant] aided and abetted in the carjacking and intended to deprive Estrada of his vehicle at the time force and fear was utilized." We disagree. The mere acquisition of the keys during the fight, in light of the entire record in this case, does not reasonably support the finding that any of the assailants had formed the intent during the fight to take Estrada's truck.

First, we would reasonably expect that if the assailants had any intention to steal Estrada's vehicle prior to or during the fight, Raymond would inform the others he had the keys as soon as he possessed them. Yet there is no evidence of any such announcement until they were in defendant's car after the fight was over. Nor did Raymond, upon discovering the keys, look for Estrada's truck or demand that Estrada tell him where the vehicle was parked. Second, and more significantly, one who assaults someone with the intent to steal his or her vehicle and gets the keys to the vehicle would presumably then take the vehicle; yet, here, all four of the assailants concluded their assault without any mention whatsoever of Estrada's keys or vehicle. Instead, they returned to defendant's car and left the scene. Just as the act of taking a car by one who steals the keys can imply that the key thief *intended* to steal the car when he took the keys, the failure to take, mention, ask about, or look for the vehicle when the keys are taken implies the absence of an intent to take the car. Thus, even if the jury could have concluded that Raymond took the keys from Estrada's pocket during the fight, the evidence does not support a reasonable inference that he (or anyone) formed an intent to take Estrada's truck prior to the end of the assault. An assault took place and the truck was subsequently stolen, but evidence of the intent necessary to commit a carjacking is absent.

### (b)  *The Argument Asserted at Trial*

At trial, the prosecutor presented an argument concerning the use of force or fear for carjacking different from the argument challenged by defendant on appeal. The prosecutor argued that after Estrada was beaten, Estrada saw his attackers return and walk toward him and his vehicle. "By that point in time, the victim had already been beaten up, and he's so frightened that there really isn't anything else that needed to be done." The argument has merit.

As set forth above, the requisite intent to deprive Estrada of possession of his truck must exist at the time of the use of force or fear. Here, there is no dispute that the attackers became aware they had the keys to Estrada's truck

no later than during the initial flight from the scene. When Raymond told defendant to drive back to the Philbin apartments, defendant knew Raymond intended to take the truck and admitted he was helping the others commit a crime. The issue, therefore, is whether there is substantial evidence that they thereafter used force or fear to take the vehicle.

■ When the People rely upon the use of fear, rather than force, it "is not necessary that there be direct proof of fear." (*People v. Holt* (1997) 15 Cal.4th 619, 690 [63 Cal.Rptr.2d 782, 937 P.2d 213].) The use of fear may be inferred from the circumstances. (*People v. Mungia* (1991) 234 Cal.App.3d 1703, 1709–1710, fn. 2 [286 Cal.Rptr. 394] [Fourth Dist., Div. Two].)[6]

Estrada's truck was parked directly in front of his apartment, about 10 feet away. Within 10 or 20 minutes after being beaten, Estrada saw his attackers return. He watched from his window as the Zamoras approached his apartment, making eye contact with them. The two tried to enter the apartment through the front door. Estrada testified that he was afraid they were going to assault him again. He stayed inside, "protecting [his] family." The Zamoras then took the truck. Based on this evidence, the jury could easily conclude that the Zamoras, backed up by defendant and Garcia in defendant's car, used fear of a further attack against Estrada or his family to deprive Estrada of his truck. We therefore reject defendant's argument.

### 2. Sufficiency of the Evidence That the Vehicle Was Taken from the Victim's Immediate Presence

Defendant contends the evidence was insufficient to establish that Estrada's truck was taken from his immediate presence. He argues the truck was not taken from Estrada's immediate presence because, by the time he and his compatriots returned to take the truck, "Estrada had left and was in his apartment." We reject this argument.

■ A vehicle is within a person's immediate presence for purposes of carjacking if it is sufficiently within his control so that he could retain possession of it if not prevented by force or fear. (*People v. Medina* (1995) 39 Cal.App.4th 643, 648 [46 Cal.Rptr.2d 112] (*Medina*); CALCRIM No. 1650.) It is not necessary that the victim be physically present in the vehicle when the confrontation occurs. (*Medina, supra,* at p. 650.)

In *Medina,* the victim was lured into a motel room by an accomplice of the defendant. (*Medina, supra,* 39 Cal.App.4th at pp. 646, 651.) There, the

---

[6] The jury in this case was instructed, in accordance with CALCRIM No. 1650, that fear, for purposes of the carjacking count, "means fear of injury to the person, himself or herself or injury to the person's family or property."

defendant and accomplices bound the victim, took his car keys, then took his car. (*Id.* at pp. 646–647.) The defendant challenged his conviction for carjacking, arguing that "actual physical proximity of the victim to the vehicle is required." (*Id.* at p. 649.) The Court of Appeal disagreed, explaining that the "only reason [the victim] was not in the car when it was taken and this was not a 'classic' carjacking, was because he had been lured away from it by trick or device." (*Id.* at pp. 651–652.)

In *People v. Hoard* (2002) 103 Cal.App.4th 599 [126 Cal.Rptr.2d 855] (Fourth Dist., Div. Two), the defendant entered a jewelry store and ordered two employees to give him the keys to the jewelry cases and to the car belonging to Sarah Gibeson, one of the employees. (*Id.* at p. 602.) The employees complied and were then directed into a back room and bound. (*Ibid.*) The defendant took jewelry from the cases and Gibeson's car. (*Ibid.*) Relying on *Medina*, this court affirmed the defendant's carjacking conviction by explaining: "Although [Gibeson] was not physically present in the parking lot when [the defendant] drove the car away, she had been forced to relinquish her car keys. Otherwise, she could have kept possession and control of the keys and her car." (*People v. Hoard, supra,* at p. 609.)

The immediate presence requirement is more easily met in this case than in *Medina* or *Hoard*. Here, although Estrada was inside his apartment at the time the Zamoras took his truck, the truck was only approximately 10 feet away from him. He watched the men through his window and made eye contact with them. Under the circumstances described above, the jury could reasonably find that Estrada was fearful of a further assault and would have acted to stop the Zamoras and retain possession of his truck if not prevented by such fear. The fact that 10 or 20 minutes had elapsed between the physical assault and the taking of the truck is insignificant. Regardless of the passage of time, fear was being used against Estrada at the time the vehicle was taken.

Defendant relies heavily on *People v. Coleman* (2007) 146 Cal.App.4th 1363 [53 Cal.Rptr.3d 505]. In that case, the owner of a glass shop drove his Chevrolet Silverado to the shop in the morning, put the keys to the Silverado in a back work area of the shop, then drove away in a truck he used in his business. (*Id.* at p. 1366.) While the owner was away, the defendant entered the shop, pointed a gun at the office manager, and told her to give him the keys to the Silverado. (*Ibid.*) (It is not clear from the opinion how far away the office manager was from the Silverado.) The office manager walked to the back of the shop, grabbed the keys to the Silverado, and gave them to the defendant. (*Ibid.*) The defendant was convicted of robbery and carjacking. (*Id.* at pp. 1365, 1367, fn. 2.) The Court of Appeal reversed the conviction for carjacking. (*Id.* at p. 1374.) Although the court "acknowledge[d] that a

carjacking may occur where neither the possessor nor the passenger is inside or adjacent to the vehicle," the circumstances in this case were "simply too far removed from the type of conduct that [the carjacking statute] was designed to address." (*Id.* at p. 1373.) The office manager, the court explained, "was not within any physical proximity to the Silverado, the keys she relinquished were not her own, and there was no evidence that she had ever been or would be a driver of or passenger in the Silverado." (*Ibid.*)

*Coleman* is distinguishable. Unlike the keys taken from the office manager in *Coleman*, the keys taken from Estrada were to his own truck. Estrada was not required to walk somewhere to get the keys; they were taken directly from him during the physical assault near his truck. Although he was inside his apartment when the attackers returned to take the vehicle, he was still only approximately 10 feet away. Indeed, he did not get closer only because of the fear that the attackers induced in him. Thus, while we do not disagree with *Coleman*, that case is not controlling here.

B.  *Admissibility of Gang Affiliation Admission During Jail Classification Interview*

Prior to trial, defendant moved in limine to suppress statements he made to Deputy Munoz during the booking process regarding his gang affiliation and gang moniker. He asserted that *Miranda*[7] warnings should have been provided and a voluntary waiver obtained prior to the booking officer's questions about gang affiliation. At the hearing on the motion, the prosecutor asserted that the "questions asked of the defendants were not to invoke an incriminating response. They were not asked about the charges in this case or the crimes that have been alleged to have happened or anything about their participation in the current crime. And it's a routine question that the jailers ask for the defendant's own safety, for the custody's own safety, as well as the other folks who are in the jail there." She further explained that "the jailers at the jail ask these questions routinely of every single person that goes into their jail. Not just the gang members. . . . [¶] [T]hey . . . ask these questions because of safety reasons. At that point in time nobody is instructing the jailers to ask anything specific of the defendants about their affiliation. That is something that they routinely do on every single case."

Defendant's counsel presented no argument at the hearing and did not request an evidentiary hearing pursuant to Evidence Code section 402.[8]

---

[7] *Miranda v. Arizona* (1966) 384 U.S. 436 [6 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

[8] Counsel for one codefendant, Garcia, spoke at the hearing. He stated that the evidence is "highly troubling with respect to [his] client. . . . [T]he only piece of evidence alleging any gang activity is this incriminating statement elicited from my client at the time of intake."

Although the court said it is troubled by the practice of making such questions part of the booking process and then using the statements against the defendants at trial, it concluded that the challenged statements fell within the booking question exception to *Miranda* and denied defendant's motion to exclude the statements.

At trial, Deputy Munoz testified that the jail classification officer asks each new inmate his name, date of birth, age, whether the inmate has previously been in jail, whether he has any medical problems, whether he has any gang affiliations, and if he has "any problems with anybody in the streets." Deputy Munoz said these questions are asked for the safety of the inmate and the custodial staff. He testified he had nothing to do with the investigation of the incident at the Philbin apartments; he merely interviews arrestees "for housing purposes."

In this case, Deputy Munoz asked defendant his name, date of birth, and whether he had any gang affiliations. Defendant told Deputy Munoz his name, birth date, and that he was affiliated with Arlanza. Deputy Munoz then asked defendant if he was an active member, associate, or former member of the gang. Deputy Munoz explained that he asked this question because a gang "dropout" may be placed in protective custody, away from the general inmate population, because he is at risk of being victimized. Defendant told Deputy Munoz that he was an active member and used the moniker "Scooby."[9]

On cross-examination, Deputy Munoz testified that he had nothing to do with the investigation of the incident that gave rise to defendant's arrest; he was "[j]ust classifying them, interviewing them for housing purposes." At one point, the deputy agreed with defense counsel that the classification "has primarily to do with the safety of the individual as well as the good order of the jail itself" and, at another point, that "the whole point of those questions [regarding gang affiliation] . . . is the safety and the good order of that individual . . . in the jail."

On redirect, the prosecutor asked Deputy Munoz: "[W]hen somebody comes into your jail, and you interview them for the classification, do you have any information about the crime for which they have been arrested?"

---

[9] Although defendant did not assert an objection to Deputy Munoz's testimony at trial, the motion in limine adequately preserved the issue for appeal. In *People v. Crittenden* (1994) 9 Cal.4th 83 [36 Cal.Rptr.2d 474, 885 P.2d 887], the court stated: "[I]f a motion to exclude evidence is made raising a specific objection, directed to a particular, identifiable body of evidence, at the beginning of or during trial at a time when the trial judge can determine the evidentiary question in its appropriate context, the issue is preserved for appeal without the need for a further objection at the time the evidence is sought to be introduced." (*Id.* at p. 127; see also *People v. Morris* (1991) 53 Cal.3d 152, 190 [279 Cal.Rptr. 720, 807 P.2d 949].) This rule applies here.

The deputy answered: "No. Just the receiving sheet." No one asked the deputy what information was included on the receiving sheet.

■ Defendant contends the court erred in allowing Deputy Munoz to testify to defendant's booking interview statements. As we explain below, whether a question about a suspect's gang affiliation during a booking interview is encompassed by the booking question exception depends upon whether, under all the facts and circumstances, the question was designed to elicit an incriminating response. Although we share the trial court's concern about the potential abuse of the booking question exception for purposes of obtaining incriminating evidence of gang membership, the record in this case does not indicate that the questions about gang affiliation were designed to elicit an incriminating response. Accordingly, we find no error.

When a defendant challenges the admissibility of defendant's postarrest statements on the ground they were elicited in violation of *Miranda*, the People have the burden of proving by a preponderance of the evidence that the statements were not the product of a *Miranda* violation. (*Missouri v. Seibert* (2004) 542 U.S. 600, 608–609, fn. 1 [159 L.Ed.2d 643, 124 S.Ct. 2601]; *People v. Dykes* (2009) 46 Cal.4th 731, 751 [95 Cal.Rptr.3d 78, 209 P.3d 1].) In reviewing a trial court's ruling on a motion to suppress based upon a violation of *Miranda*, " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 385 [106 Cal.Rptr.3d 771, 227 P.3d 342].) Here, the facts concerning the booking interview are not in dispute. Accordingly, we review the admissibility of the defendant's statements de novo.

■ In *Miranda*, the United States Supreme Court held that the Fifth Amendment right against self-incrimination prohibits the prosecution from using "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda, supra*, 384 U.S. at p. 444.) These "procedural safeguards" require that a person in custody "first be informed in clear and unequivocal terms that he has the right to remain silent," "that anything said can and will be used against the individual in court," that he has "the right to consult with a lawyer and to have the lawyer with him during interrogation," and that "if he is indigent a lawyer will be appointed to represent him." (*Id.* at pp. 467–473, 479.) Statements made in violation of these rules are inadmissible against the detained individual to prove guilt in a criminal case. (*Id.* at p. 479; *People v. Stitely* (2005) 35 Cal.4th 514, 535 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

In *Rhode Island v. Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682] (*Innis*), the Supreme Court clarified the nature of interrogation for purposes of the *Miranda* rule. Generally, "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. . . . [T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." (*Innis, supra*, at pp. 300–301, fns. omitted.) The court noted that this definition does not mean that "the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." (*Id.* at p. 301, fn. 7.)

In *Pennsylvania v. Muniz* (1990) 496 U.S. 582 [110 L.Ed.2d 528, 110 S.Ct. 2638] (*Muniz*), the Supreme Court considered whether incriminating statements made by a drunk driving suspect during booking were admissible notwithstanding the absence of the *Miranda* warnings. In that case, a police officer asked the defendant questions regarding his name, address, height, weight, eye color, date of birth, and current age. (*Muniz, supra*, at pp. 585–586.) After responding to these questions, the "officer then asked [the defendant], 'Do you know what the date was of your sixth birthday?' After [the defendant] offered an inaudible reply, the officer repeated, 'When you turned six years old, do you remember what the date was?' [The defendant] responded, 'No, I don't.' " (*Id.* at p. 586.)

Justice Brennan, writing for a four-justice plurality, indicated that the booking questions constituted custodial interrogation for purposes of *Miranda*. (*Muniz, supra*, 496 U.S. at p. 601 (plur. opn. of Brennan, J.).) A fifth justice, Justice Marshall, agreed with this threshold conclusion. (*Id.* at pp. 608–611 & fn. 1 (conc. & dis. opn. of Marshall, J.).) However, the plurality drew a distinction between the first seven questions—regarding the defendant's name, address, height, weight, eye color, date of birth, and current age—and the question regarding the defendant's sixth birthday. Although the first seven questions constituted custodial interrogation, Justice Brennan explained that the answers "are nonetheless admissible because the questions fall within a 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.' [Citation.]" (*Id.* at p. 601 (plur. opn.

of Brennan, J.).) These "questions were 'requested for record-keeping purposes only,' [citation] and therefore the questions appear reasonably related to the police's administrative concerns. In this context, therefore, the first seven questions asked at the booking center fall outside the protections of *Miranda* and the answers thereto need not be suppressed." (*Id.* at pp. 601–602, fn. omitted.) As for the response to the question regarding the defendant's sixth birthday, the plurality held that it must be suppressed. (*Id.* at p. 605.) Although the plurality provided little explanation for the distinction, implicit in the different treatment is that the latter question was designed to elicit more than mere biographical data necessary to complete the defendant's booking.

■ Significantly, the *Muniz* plurality noted an exception to the booking question exception: " '[R]ecognizing a "booking exception" to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.' " (*Muniz, supra*, 496 U.S. at p. 602, fn. 14 (plur. opn. of Brennan, J.).)[10] The use of the phrase, "*designed to elicit incriminatory admissions*," instead of the more objective, "*reasonably likely* to elicit an incriminating response" language used in *Innis*, suggests that the intent of the interrogating officer is more important in evaluating the applicability of the booking question exception than in establishing interrogation generally. Indeed, based on this difference in wording, "many courts have adopted a subjective intent test, focusing on the intent of the police in questioning suspects during booking." (Skelton & Connell, *The Routine Booking Question Exception to Miranda* (2004) 34 U. Balt. L.Rev. 55, 81; see, e.g., *U.S. v. Virgen-Moreno* (5th Cir. 2001) 265 F.3d 276, 293–294; *Velazquez v. Lape* (S.D.N.Y. 2008) 622 F.Supp.2d 23, 30 ["the word 'designed' requires a showing of deliberate police 'design' rather than the negligence test" in *Innis*].)

The fact that the information gathered from routine booking questions turns out to be incriminating does not, by itself, affect the applicability of the exception. (*Rosa v. McCray* (2d Cir. 2005) 396 F.3d 210, 221; *U.S. v. Ochoa-Gonzalez* (8th Cir. 2010) 598 F.3d 1033, 1038; *U.S. v. McLaughlin* (8th Cir. 1985) 777 F.2d 388, 391.) In *U.S. ex rel. Hines v. LaVallee* (2d Cir.

---

[10] Justice Rehnquist, writing for four justices, concluded that the responses to the booking questions were not testimonial and, therefore, "it is unnecessary to determine whether the questions fall within the 'routine booking question' exception to *Miranda* Justice Brennan recognizes." (*Muniz, supra*, 496 U.S. at p. 608 (conc. & dis. opn. of Rehnquist, J.).) Justice Marshall rejected the notion of a routine booking question exception to *Miranda*, and further explained that, even if such an exception is warranted, the booking questions asked in that case were not within the scope of such an exception. (*Id.* at pp. 608–611 (conc. & dis. opn. of Marshall, J.).)

1975) 521 F.2d 1109, for example, an assailant told his robbery and rape victim during the commission of the crimes that he had been married 11 years and had two children. (*Id.* at p. 1110.) After the defendant was arrested and before being *Miranda*ized, he was asked "background data (i.e., his name, address, age, marital status) . . . ." (*U.S. ex rel. Hines v. LaVallee, supra*, at p. 1110.) He told the officer that he had been married for 11 years and had two children. (*Ibid.*) Although the response was incriminating, the Second Circuit held that it was admissible because it "constituted merely basic identification required for booking purposes . . . ." (*Id.* at p. 1113, fn. omitted.) Thus, if the questions to defendant regarding his gang affiliation and moniker are legitimate booking questions and not designed to elicit an incriminating admission, defendant's responses are admissible despite their incriminating effect and the absence of *Miranda* warnings.

Although the recognition of a routine booking question exception to *Miranda* and the "design" exception to the booking question exception are expressed by a mere plurality in *Muniz*, these principles are now considered settled. (See, e.g., *U.S. v. Brown* (8th Cir. 1996) 101 F.3d 1272, 1274 ["It is well-settled that routine biographical data is exempted from *Miranda*'s coverage."]; *Presley v. City of Benbrook* (5th Cir. 1993) 4 F.3d 405, 408, fn. 2 ["In the wake of *Muniz*, it has been universally accepted by courts, both federal and state, that a routine booking question exception to the Fifth Amendment exists."].) Indeed, California and federal courts applied a booking question exception long before it was recognized in *Muniz*. (See, e.g., *People v. Rucker* (1980) 26 Cal.3d 368, 387 [162 Cal.Rptr. 13, 605 P.2d 843] (*Rucker*); *U.S. v. Booth* (9th Cir. 1981) 669 F.2d 1231, 1238; *U.S. ex rel. Hines v. LaVallee, supra*, 521 F.2d at pp. 1112–1113.)[11]

■ In determining whether a question is within the booking question exception, courts should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information. (*U.S. v. Avery* (6th Cir. 1983) 717 F.2d 1020, 1025.) Courts have considered several factors, including the nature of the questions, such as whether they seek merely identifying data necessary for booking (see, e.g., *U.S. v. Washington* (9th Cir. 2006)

---

[11] In *Rucker*, the court stated that "[t]he *Miranda* safeguards are not necessary at a proper booking interview at which certain basic information is elicited having nothing to do with the circumstances surrounding any offense with which the defendant has been charged." (*Rucker, supra*, 26 Cal.3d at p. 387.) The court held that while the state has a legitimate right to "basic, neutral information that is necessary for proper jail administration," it cannot use "the arrestee's responses in any manner in a subsequent criminal proceeding." (*Id.* at p. 389.) This exclusionary rule, however, did not survive the enactment of article I, section 28, subdivision (d) of the California Constitution, commonly referred to as Proposition 8. (*People v. Herbst* (1986) 186 Cal.App.3d 793, 799–800 [233 Cal.Rptr. 123]; *People v. Hall* (1988) 199 Cal.App.3d 914, 921 [245 Cal.Rptr. 458].)

462 F.3d 1124, 1132 (*Washington*); *U.S. v. Gonzalez-Sandoval* (9th Cir. 1990) 894 F.2d 1043, 1046; *U.S. v. Minkowitz* (E.D.N.Y. 1995) 889 F.Supp. 624, 627; *U.S. v. Booth, supra,* 669 F.2d at p. 1238; *Hughes v. State* (1997) 346 Md. 80, 94–95 [695 A.2d 132, 139]); the context of the interrogation, such as whether the questions were asked during a noninvestigative clerical booking process and pursuant to a standard booking form or questionnaire (see, e.g., *U.S. v. Pacheco-Lopez* (6th Cir. 2008) 531 F.3d 420, 425; *Rosa v. McCray, supra,* 396 F.3d at pp. 221–222; *U.S. v. Mata-Abundiz* (9th Cir. 1983) 717 F.2d 1277, 1280; *U.S. v. Ortiz* (E.D.Pa. 1993) 835 F.Supp. 824, 835); the knowledge and intent of the government agent asking the questions (see, e.g., *Rosa v. McCray, supra,* at pp. 221–222; *U.S. v. Brown, supra,* 101 F.3d at p. 1274; *U.S. v. Scott* (1st Cir. 2001) 270 F.3d 30, 43–44, fn. 8; *U.S. v. Gill* (D.Me. 1995) 879 F.Supp. 149, 152); the relationship between the question asked and the crime the defendant was suspected of committing (*U.S. v. Foster* (9th Cir. 2000) 227 F.3d 1096, 1103; *Gonzalez-Pena v. Herbert* (W.D.N.Y. 2005) 369 F.Supp.2d 376, 394; *U.S. v. Minkowitz, supra,* at pp. 627–628); the administrative need for the information sought (*U.S. v. Gaston* (D.C. Cir. 2004) 360 U.S. App.D.C. 62 [357 F.3d 77, 87]; *U.S. v. Peterson* (D.D.C. 2007) 506 F.Supp.2d 21, 24–25); and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the guise or pretext of seeking routine biographical information (see, e.g., *U.S. v. Clark* (6th Cir. 1993) 982 F.2d 965, 968; *U.S. v. Doe* (1st Cir. 1989) 878 F.2d 1546, 1551; *U.S. v. Glen-Archila* (11th Cir. 1982) 677 F.2d 809, 816; *U.S. v. Lewis* (E.D.Wis. 2010) 685 F.Supp.2d 935, 938–939).

We have been referred to only one federal case—*Washington, supra,* 462 F.3d 1124—addressing the applicability of the booking question exception to questions about gang affiliation or gang moniker. In *Washington,* the defendant was arrested after he was identified as one of several people who robbed a bank in California. (*Id.* at pp. 1128–1129.) Following his arrest and prior to being informed of his *Miranda* rights, the defendant was asked a "series of background questions, including his name, date of birth, address, medical condition, gang moniker, and gang affiliation." (*Id.* at p. 1129.) At a hearing to suppress his postarrest statements, the interrogating officer testified that at the time of the questioning he had already been informed of the defendant's name, gang moniker, and other background information. (*Ibid.*) However, he said he needed to ask the defendant "this information to ensure that law enforcement's information was accurate." (*Ibid.*) The trial court denied the motion to suppress and the Ninth Circuit affirmed. The Ninth Circuit Court of Appeals explained: "The record in the instant case shows that agents routinely obtain gang moniker and gang affiliation information . . . in order to ensure prisoner safety. The question regarding [the defendant's] gang moniker therefore was a routine booking question." (*Id.* at p. 1133, fn. omitted.) The court rejected the argument that giving his gang moniker, "Rock," would

connect him with the crime based on an informant's statement that " 'Rock' was involved with the bank robbery . . . ." (*Ibid.*) "Asking about a nickname," the court explained, "even if it is for identification purposes, is no different from simply asking for a suspect's name. Questions about a person's identity are not unconstitutional even if identification of the person may help lead to the prosecution of that person for a crime." (*Ibid.*) Finally, the fact that the interrogating officer already knew the answers to the booking questions was insignificant: "A desire to confirm the information for booking purposes does not mean that the question constitutes interrogation." (*Id.* at p. 1133, fn. 1.)[12] Because the *Washington* court treated the gang moniker question as merely a question about the defendant's "nickname," which was asked only for "identification purposes," its holding and rationale are arguably inapposite here. Defendant in the present case was not asked about his gang affiliation for biographical or identification purposes, but rather for jail security purposes. *Washington* does not address this situation.

We have not been referred to a published California case that squarely addresses the issue presented here. Defendant relies primarily on *People v. Morris* (1987) 192 Cal.App.3d 380 [237 Cal.Rptr. 402] (*Morris*), in which the Court of Appeal held that a defendant's admission to a booking officer that he killed his sister-in-law should have been excluded. The admission was made after the completion of the initial booking interview when the booking officer went to the defendant's cell to put an identifying wristband on the defendant. (*Id.* at p. 388.) The officer asked the defendant whether jail officials " 'should anticipate any type of problem with his being there in jail.' " (*Ibid.*) "When defendant replied, ' "I don't think so," ' [the officer] went on and asked defendant ' "Who are you accused of killing?" ' Defendant 'cried a little bit and then he stated, "My brother, Randy Morris, was in last October for it." And "I never did anything like this before—I killed my sister-in-law." ' " (*Ibid.*)

*Morris* is obviously distinguishable on its facts. Defendant, however, relies on *Morris* not for its actual holding, but for the court's use of a hypothetical regarding the booking of a gang member. In the course of its analysis, the *Morris* court stated: "The focus of our analysis is *not* what the police may lawfully ask a criminal suspect to ensure jail security. The police may ask

---

[12] Our research reveals one federal case, *U.S. v. Willock* (D.Md. 2010) 682 F.Supp.2d 512, in which an incarcerated prisoner was interviewed and asked questions about his gang affiliation. (*Id.* at pp. 528–529.) In a subsequent prosecution, he moved to suppress the statements made during the interview. In opposing the motion, the government did not argue that the booking question exception applied. (*Id.* at p. 532, fn. 25.) Nevertheless, the court noted: "Eliciting information from an inmate about his gang affiliation solely for prison administrative purposes does not implicate *Miranda*. It is only when such information is used against the inmate in a prosecution that *Miranda* warnings are required." (*Id.* at p. 533, fn. 26.) Because of the unique circumstances and the issues presented in *Willock*, it provides little guidance for us in this case.

whatever the needs of jail security dictate. However, when the police know or should know that such an inquiry is reasonably likely to elicit an incriminating response from the suspect, the suspect's responses are not admissible against him in a subsequent criminal proceeding unless the initial inquiry has been preceded by *Miranda* admonishments. A police officer's concerns for jail security, encompassing the safety of the suspect, can be triggered by a variety of factors, some of which would have nothing to do with the offense underlying the suspect's incarceration and, as importantly, could only be explored by inquiring of the defendant himself. Thus a suspect who is booked into jail wearing tattoos or other indicia of gang affiliation might alert the booking officer to the possibility of gang-related violence; the quickest way for the officer to resolve such concern is to ask the suspect whether jail personnel should anticipate any trouble in this regard once the suspect becomes housed in the jail. *So long as the offense for which the suspect is in custody is not itself gang-related, there is no reason the officer should foresee the question will elicit an incriminating response.* In such a circumstance, an incriminating response is not the product of affirmative police conduct and would be admissible in the absence of *Miranda* warnings. [¶] The difference in the instant case is the direct and recognized link between the booking officer's inquiry and the crime for which defendant had been arrested and was in custody." (*Morris, supra,* 192 Cal.App.3d at pp. 389–390, third italics added.)[13]

In this hypothetical, the *Morris* court drew a distinction based upon whether the suspect was under arrest for a gang-related crime and that the questioning officer knew that fact. As noted above, although the booking officer's knowledge and the relationship between the question asked and the crime the arrestee is suspected of committing are relevant factors in evaluating whether the question is designed to elicit an incriminating response, they are not necessarily determinative.

We now turn to our analysis in the light of the foregoing authorities. Initially, we note that questions about gang affiliation do not share the same qualities as mere biographical or identifying data necessary for booking. As

---

[13] Our research has revealed one out-of-state case addressing this issue. In *Pierce v. State* (Tex.App. 2007) 234 S.W.3d 265, the defendant was asked to identify his former gang identification for the "county jail's classification department." (*Id.* at p. 271.) Gang affiliation is inquired into for classification because of "threats to other inmates and to the jail facility security and safety because gang activity occurs in the jail." (*Ibid.*) The Texas Court of Appeals held that "in the absence of evidence that the offense for which [the defendant] was in custody was gang-related, the trial court did not abuse its discretion in admitting [the defendant's] former gang affiliation acknowledgment." (*Id.* at p. 272.)

one court explained, "information as to a suspect's identity is required immediately to enable the police to book and arraign the suspect and to permit the magistrate to determine the amount of bail to be fixed and whether persons claiming to be relatives should be allowed to confer with the suspect." (*U.S. ex rel. Hines v. LaVallee, supra*, 521 F.2d at p. 1112.) Information about one's gang affiliation does not appear to serve any of these purposes; the state can book, arraign, and identify a suspect's relatives without knowing the arrestee's gang affiliation. Indeed, Deputy Munoz in this case did not indicate that his questions regarding a person's gang affiliation or moniker were needed for identification, but rather to classify the inmate for jail security purposes.

██ Nevertheless, the *Muniz* plurality indicated that the booking question exception applies not only to biographical data, but more broadly to questions "reasonably related to the *police's administrative concerns.*" (*Muniz, supra*, 496 U.S. at pp. 601–602 (plur. opn. of Brennan, J.), italics added, fn. omitted; see also *Rucker, supra*, 26 Cal.3d at p. 387 ["limited information needed at a booking procedure is required solely for the purposes of internal jail administration"].) The classification of inmates by gang affiliation for jail security purposes can be a legitimate administrative concern. (See, e.g., *Harbin-Bey v. Rutter* (6th Cir. 2005) 420 F.3d 571, 576; *Morris, supra*, 192 Cal.App.3d at pp. 389–390; *U.S. v. Willock, supra*, 682 F.Supp.2d at p. 532, fn. 25.) Here, Deputy Munoz testified that the gang questions are asked for purposes of housing the inmates and to protect the safety of the inmate and the custodial staff. It is reasonable to take steps to ensure that members of rival gangs are not placed together in jail cells. Thus, there does appear to be a legitimate administrative purpose for the question.

Whether the administrative purpose is a mere guise or pretext for questions actually designed to elicit incriminating responses is a close question. Given the prevalence of gang-related offenses, questions about an arrestee's gang affiliation are, by their nature, more likely to be incriminating than basic identifying questions about one's name, address, and age. In this vein, we note the following concern expressed by the trial court in this case: "These [questions about gang affiliation] trouble me because they're really asked for two purposes it seems to me: One for classification, but also to garner evidence for the case because they're routinely used as evidence in every gang case I have had. [¶] So the cases speak about being used for routine purpose only. It's fine. But if it's asked to . . . garner evidence for the case, it's not, then here it seems to me it's being used for both routinely."

Although we share the trial court's concern, we cannot say on this record that the gang-related questions asked of defendant are outside the booking question exception. The questions appear to have been asked in a legitimate booking context, by a booking officer uninvolved with the arrest or investigation of the crimes, pursuant to a standard booking form. As noted above, the questions were asked for legitimate, noninvestigatory purposes related to the administration of the jail and concerns for the security of the inmates and staff. Significantly, there is no evidence that Deputy Munoz had any knowledge of the crimes for which defendant was arrested or was suspected of committing. The interview took place the same day defendant was arrested, two days before defendant was formally charged with any crime. Although defendant was ultimately charged with certain gang enhancements and the crime of active participation in a criminal street gang, our record does not indicate whether the arresting officers indicated that this was a gang-related crime in any prebooking reports or, if they had, whether Deputy Munoz had seen such a report or talked to the officers. Indeed, Deputy Munoz testified that while he had a "receiving sheet," he did not have any information about the crime for which the arrestee had been arrested.[14]

We wish to make clear that we do not hold that questions about gang affiliation or monikers are per se booking questions for which the *Miranda* warnings need never be given. As stated above, the booking question issue requires careful scrutiny of the facts and circumstances in each case. Under other circumstances or a more complete record, the facts may establish that similar questions are not within the booking question exception or are in fact designed in part to elicit an incriminating response. We hold merely that, on the record before us, the prosecution satisfied its burden of showing by a preponderance of the evidence that the questions about defendant's gang affiliation and moniker were booking questions not designed to elicit an incriminating response. Accordingly, defendant's responses were admissible notwithstanding the absence of *Miranda* warnings.

C.  *Denial of Motion to Bifurcate the Gang Enhancement and Sever the Gang Crime**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[14] As noted above, defendant did not challenge or object to the prosecutor's offer of proof at the hearing on the motion in limine or request an evidentiary hearing. Nor did defense counsel question Deputy Munoz at trial regarding the deputy's actual knowledge of the facts surrounding defendant's arrest or the nature of the information on the receiving sheet.

*See footnote, *ante*, page 609.

## IV. DISPOSITION

The judgment is affirmed.

Richli, Acting P. J., and Miller, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 18, 2011, S191621. Kennard, J., was of the opinion that the petition should be granted.