Filed 6/23/15  P. v. Jackson CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>                Plaintiff and Respondent,<br><br>     v.<br><br>GERALD XAVIER JACKSON,<br><br>                Defendant and Appellant. | B257237<br><br>(Los Angeles County<br> Super. Ct. No. BA408886) |

APPEAL from the judgment of the Superior Court of Los Angeles County.
Leslie A. Swain, Judge.  Affirmed.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and
Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney
General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Nathan
Guttman, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Gerald Jackson was found guilty by jury of kidnapping to commit robbery, robbery, forcible sexual penetration and carjacking. His sole contention on appeal is that the carjacking count is not supported by substantial evidence that the vehicle was taken from the immediate presence of the victim by force or fear. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Our summary is drawn only from those facts material to the narrow issue presented.

Shortly after midnight on February 24, 2013, Michelle A. was driving on Kingsley Drive in Hollywood, having just visited with her brother. She was driving a rental car--a black Ford Focus. She came to a stop at the intersection with Santa Monica Boulevard, and noticed two young men standing on the corner. One of them, wearing a baseball cap, approached the front passenger side of Michelle's car. He seemed "really anxious" and asked if Michelle could give him and his brother a ride, and made some sort of reference to being bothered by some individuals with a gun who "hate gay people."

Michelle initially said no, but then said it was alright, believing the two men were in danger. The man in the cap got into the front passenger seat, and defendant got into the back passenger seat. The man in the cap started to give Michelle directions where to drive them. Michelle began to worry because it was not in the general direction of Vermont Avenue which is where he had said they wanted to go before getting into the car.

After they made a few turns and were in a residential area with dark streets, the man in the cap turned to Michelle and told her to stop the car and turn off the engine. He told her, "This is a scam, bitch. We have a gun." He told her to give him her wallet. Michelle got her wallet from her purse and gave it to him. The man in the cap took the money from the wallet (approximately $30) and handed the wallet to defendant in the back seat. Michelle believes defendant took her bank debit card from her wallet at that time. Michelle said to please not take her license, and to let her go, and both men laughed.

2

Defendant and the man in the cap told Michelle they did not believe her that she did not have more money. They started to poke around in the car, inside the glove box and seat pockets. Because they told her they had a gun, Michelle did not try to escape. The man in the cap then ordered Michelle to get in the back seat. She started to open the door, but the man in the cap ordered her to climb over the seat.

When she sat down behind the driver's seat, defendant turned to her and pulled down her shirt and bra, exposing both breasts. The man in the cap, still in the front seat, slapped at her breasts and said "nice titties." He then moved into the driver's seat. Michelle started to think about how to escape, but was concerned about defendant who told her not to try anything, because he had a gun, and would kill her. The man in the cap then started the car and drove off.

Defendant told Michelle to keep her head down and her eyes closed and to pretend to be asleep. He said, "I will kill you. I've been to jail before. I'm not scared to go back to jail. I will kill you." Every time she tried to peer up to see where they were, he told her, "Bitch, get your head down. I will f---ing kill you." They made several brief stops, including at an abandoned lot and a liquor store, but would then start driving again.

Outside the liquor store, defendant demanded Michelle tell him her pin number. He said if she lied and gave him the wrong number, he would kill her. She told him her pin number. Defendant and his accomplice then said they should go find an ATM, so they drove off again. They made several more stops, including at a gas station, but defendant, who got out alone, could not withdraw money from the ATM. Defendant seemed "angry" about not being able to withdraw any money. She swore to defendant she had given him the correct number and did not know why it was not working.

At some point while they were driving around, defendant yanked Michelle's pants and underwear down, and assaulted her, putting his fingers inside her vagina.

They eventually drove to a Bank of America near the USC campus and stopped there because Michelle's debit card was issued from Bank of America. The man in the cap parked the car in front of the ATM. Defendant got out and started to put bags of Michelle's belongings into the trunk. Michelle was scared he was going to force her into

3

the trunk as well. She "begged" defendant to let her help him use the card. Approaching the ATM, she saw a man on a bicycle at the next machine over.

Michelle tried to withdraw money but also was unable to, and she recalled she still had a check pending that probably had not cleared. She started to talk loudly, saying words to the effect of do not "hurt me," hoping the man on the bike would hear her and help. Defendant told her to "shut the f--k up" or he would kill her. She decided she had to try to escape, so she walked over to the man with the bike, and told him she did not know the two men and she needed his help. Defendant grabbed her by the shoulders and tried to pull her back. The man in the cap rushed up and tried to kiss her, telling the man with the bike that Michelle was his girlfriend and she was just acting crazy. Michelle yelled she was not his girlfriend and repeated that she did not know them. She struggled with defendant and the man in the cap, who continued to try to pull her back toward the car. At that point, a man who appeared to be homeless walked up to the area and asked what was going on. Defendant turned and went back to the car and yelled at the man in the cap that he was "tired of this bitch. Let's go."

Defendant and his accomplice sped off in the Ford, leaving Michelle with the homeless man and the man with the bike. Both the homeless man and the man on the bike left and Michelle flagged down a passing car. The woman driver called 911 and waited with Michelle until police arrived. The man on the bike also returned, having found a campus security guard.

Defendant was charged by information with kidnapping to commit robbery (Pen. Code, § 209, subd. (b)(1)), robbery (§ 211), forcible sexual penetration (§ 289, subd. (a)(1)(A)), and carjacking (§ 215). It was also specially alleged as to the sexual penetration count that defendant kidnapped the victim, substantially increasing her risk of harm in violation of section 667.61, subdivisions (a) and (d). It was further alleged as to all counts that defendant had suffered a prior serious felony and two prior prison terms within the meaning of sections 667, subdivision (a)(1) and 667.5, subdivision (b), respectively.

Defendant pled not guilty and denied the special allegations.

4

The case proceeded to a jury trial in March 2014. The jury found defendant guilty on all four counts and found true the special allegation. Defendant waived jury and admitted the prior allegations. The court denied defendant's motion to strike pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. The court sentenced defendant to an aggregate state prison term of 50 years to life, plus a determinate term of 30 years.

This appeal followed.

## DISCUSSION

" 'To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Johnson* (2015) 60 Cal.4th 966, 988 (*Johnson*).)

As relevant here, Penal Code section 215, subdivision (a) defines carjacking as "the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, . . . against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear."

Defendant contends his conviction on count 4 for carjacking must be reversed because when he sped off in the Ford, Michelle was outside the car, near the ATM, and had reached a place of safety, in the presence of two other individuals, and therefore the car was not taken from her by force or fear as required by the statutory language. We are not persuaded.

"A vehicle is within a person's immediate presence for purposes of carjacking if it is sufficiently within his control so that he could retain possession of it if not prevented by force or fear. [Citations.] It is not necessary that the victim be physically present in the vehicle when the confrontation occurs." (*People v. Gomez* (2011) 192 Cal.App.4th 609, 623; accord, *People v. Medina* (1995) 39 Cal.App.4th 643, 650.)

5

While the classic carjacking scenario occurs when a suspect forces a driver from his or her vehicle and absconds with the car, courts have routinely held the offense of carjacking occurs under a broad range of circumstances. (See, e.g., *People v. Gomez*, *supra*, 192 Cal.App.4th at pp. 614-615, 623-625 [evidence supported carjacking verdict where multiple defendants physically assaulted victim, took his keys, and then drove off in his truck a few minutes later after he had escaped inside to his apartment to avoid further assault]; *People v. Medina*, *supra*, 39 Cal.App.4th at pp. 646-647, 651-652 [evidence that the victim was lured into motel room, assaulted, and his keys taken in order to steal his car parked outside was sufficient to support carjacking conviction].)

The Supreme Court in *Johnson* recently sustained a carjacking conviction where the defendant entered the victim's home, killed her, took her keys from the kitchen, and fled in her car which had been parked in the garage. (*Johnson*, *supra*, 60 Cal.4th at pp. 990-991.) This case falls squarely within the letter and spirit of the carjacking statute and the Supreme Court's holding in *Johnson*. The carjacking did not begin when defendant sped off in the Ford, leaving Michelle at the ATM. It began the moment defendant and his accomplice made threats of violence to Michelle and ordered her into the back seat of the car. They continued to use fear and threats of violence over the course of the next hour, as they drove around in her car, assaulting her and looking for locations to steal further money from her by using her stolen debit card at an ATM. She was still under threats of violence from defendant at the time she was standing just outside the car, at the ATM, and was prevented from regaining possession of the car.

Defendant's reliance on *People v. Coleman* (2007) 146 Cal.App.4th 1363 is unavailing. The defendant in *Coleman* went into a shop and demanded, at gunpoint, the keys to a truck parked outside. The truck belonged to the shop's owner, who was not there at the time. The employee, who had not been in or near the truck, turned over the keys to the defendant, who then fled in the truck. (*Id*. at pp. 1366-1367.) *Coleman* acknowledged that a carjacking may occur where the victim is neither "inside [n]or adjacent to the vehicle" (*id*. at p. 1373), but, found the facts there to be too attenuated to

fit within the definition of a carjacking.  The facts here are plainly distinguishable from *Coleman*.

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, J.


WE CONCUR:

BIGELOW, P. J.



RUBIN, J.