Filed 7/18/13  P. v. Washington CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM BENJAMIN WASHINGTON,<br><br>    Defendant and Appellant. | E056940<br><br>(Super.Ct.No. INF1100472)<br><br>**OPINION** |

APPEAL from the Superior Court of Riverside County.  David B. Downing, Judge.  Affirmed.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and A. Natasha Cortina, and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

Members of the Gateway Posse Crips challenged defendant William Benjamin Washington to fight.  Because he was holding his baby daughter at the time, he declined.

1

Later, however, after hearing that they were bragging about having jumped him, he carried out a drive-by shooting, wounding one Gateway member.

A gang expert opined that defendant was a member of a rival gang — the 12th Street Mafia — based on multiple items of evidence, including defendant's statements to various booking officers. Thus, a jury found defendant guilty of the crime of active gang participation (Pen. Code, § 186.22, subd. (a)); it also found several gang enhancements true (*id.*, subd. (b)).

Defendant contends that his statements at booking were not admissible under the routine booking question exception to *Miranda v. Arizona* (1966) 384 U.S. 436. We disagree. Moreover, we will hold that the asserted error was harmless beyond a reasonable doubt, because there was massive evidence, in addition to his statements, that he was a member of 12th Street.

I

FACTUAL BACKGROUND

The evidence regarding defendant's guilt or innocence in connection with the shooting is not particularly relevant to the issues raised on appeal. Neither is the evidence regarding such elements of active gang participation and the gang enhancements as a pattern of gang activity and the specific intent to promote, further, or assist in felonious criminal conduct by gang members. The evidence regarding defendant's gang membership *is* significant, however, so we summarize it here briefly.

2

The victim of the shooting was a member of the Gateway Posse Crips. When he was shot, he was standing outside a house with another member of Gateway.

The 12th Street Mafia is a rival gang of Gateway. It is also known as the 12th Street Hustlers or just 12th Street.

A gang expert concluded that defendant was a member of 12th Street, based on the following evidence.

Defendant had a 12th Street Hustler tattoo. He also had a "D Town All Star" tattoo, which the gang expert had seen only on members of 12th Street. He had several tattoos of his moniker, "Solo." Defendant's half brother "Big Solo" was one of the founding members of 12th Street.

On defendant's cell phone, there were photographs of him throwing a 12th Street hand sign. On his Facebook page, there was another photograph of him throwing a 12th Street hand sign while wearing all red, which was the 12th Street color.

On Facebook, defendant had posted, "I got my whole . . . H12D[1] tatted on ma back can't tell me I don't love my [plural N-word]." He had also posted "free ma T [plural N-word]," followed by the monikers of several 12th Street members. In addition, he had posted, "[F]uck Gateway" and "[A]ll worms is tricks . . . ." 12th Street members refer to Gateway members as "gummy worms" or "worms."

---

**1**     Meaning "hood." In text messages, defendant similarly used "G12D" to mean "good."

Police officers had seen defendant with 12th Street members on five occasions. In November 2008, he was seen near a fight at which people were shouting, "12th Street Mafia." In December 2008, he was seen with two 12th Street members. In October 2009, he was seen with another 12th Street member. In March 2010, he was seen at a fight involving 12th Street members. Finally, in September 2010, he was found in a vehicle with 12th Street members.

Defendant had admitted to a police officer that he was a member of 12th Street. In addition, it was stipulated that, on three different dates — January 2, 2010, January 7, 2011, and February 14, 2011 — defendant had admitted to three different sheriff's deputies that he was a member of the 12th Street Hustlers, with the moniker Solo.

When defendant was interviewed in connection with this case, he admitted that he used to be a gang member but claimed he was not a gang member anymore.

II

PROCEDURAL BACKGROUND

After a jury trial, defendant was convicted of:

Count I: Attempted manslaughter (Pen. Code, §§ 192, subd. (a), 664), with a great bodily injury enhancement (Pen. Code, § 12022.7, subd. (a)) and a gang enhancement (Pen. Code, § 186.22, subd. (b)).

Count II: Assault with a firearm (Pen. Code, § 245, subd. (a)(2)), with a great bodily injury enhancement and a gang enhancement.

Count III: Active gang participation (Pen. Code, § 186.22, subd. (a)).

4

He was sentenced to 18 years 6 months in prison, plus the usual fines and fees.

III

THE ROUTINE BOOKING QUESTION EXCEPTION

As mentioned, it was stipulated that defendant had admitted to three sheriff's deputies that he was a member of the 12th Street Hustlers, with the moniker Solo. Actually, although the jury was not so informed, he made these admissions during booking interviews and without any *Miranda* warnings.

Defendant contends that the introduction of these admissions violated *Miranda*. As he concedes, this contention is contrary to this court's holding in *People v. Gomez* (2011) 192 Cal.App.4th 609 (Fourth Dist., Div. Two). Accordingly, he urges us to reconsider *Gomez*.

A.    *Additional Procedural Background.*

In October 2011, when the trial was about to start, defendant filed a motion in limine. In it, he asked the trial court to suppress his statements "during the booking and classification process," arguing that "the questions posed . . . were for an investigative purpose[,] to [e]licit incriminating information in violation of *Miranda*."

The trial court held an evidentiary hearing at which the three booking officers testified. After the hearing, the trial court ruled that defendant's statements were admissible.

Two days later, the trial court learned that the public defender's office had a conflict of interest. As a result, the trial was taken off calendar, and new counsel for defendant was appointed.

In April 2012, when the rescheduled trial was about to start, the trial court held a second evidentiary hearing at which the same three booking officers testified. After the hearing, it ruled once again that defendant's statements were admissible.

B.    *Additional Factual Background*.

Preliminarily, there seems to be some confusion about precisely what evidence is relevant. Defendant cites and discusses only the testimony at the *second* evidentiary hearing. The People, however, cite and discuss only the testimony at the *first* evidentiary hearing.

Actually, defendant is correct. The trial court had the inherent power to reconsider its in limine ruling. (*Jackson v. Superior Court* (2010) 189 Cal.App.4th 1051, 1066.) Its first ruling was therefore superseded by its second ruling. The only issue before us is whether its second ruling was erroneous.[2]

Hence, we summarize the evidence presented at the second evidentiary hearing.

---

[2]    The People argue that defendant did not have to be given *Miranda* warnings when he was booked because he had already been given them just hours earlier, when he was arrested. There was some evidence of this at the first evidentiary hearing, but not at the second evidentiary hearing. Accordingly, we cannot sustain the trial court's ruling on this ground.

1. *Booking by Sergeant Welker on January 2, 2010.*

On January 2, 2010, Sergeant James Welker conducted a booking interview of defendant. Defendant was not given *Miranda* warnings.

Every new inmate is asked the same questions, pursuant to a standard form. The questions are asked for jail safety purposes. The form includes questions about gang affiliation. Sergeant Welker knew that booking information is "occasionally" shared with other law enforcement officers.

During the interview, defendant said he was a member of the 12th Street Hustlers, and his moniker was Solo.

2. *Booking by Corporal Sappington on January 7, 2011.*

On January 7, 2011, Corporal Jerry Sappington conducted a booking interview of defendant. Defendant was not given *Miranda* warnings.

Every new inmate is asked the same questions, pursuant to a standard form. The questions are asked for safety and housing purposes. The form includes questions about gang affiliation. Corporal Sappington knew that investigating officers could obtain booking information, on request.

During the interview, defendant said he was a member of the 12th Street Hustlers, his moniker was Solo, and he did not get along with Gateway Posse.

3. *Booking by Corporal Higgins on February 14, 2011.*

On February 14, 2011, Corporal Matthew Higgins conducted a booking interview of defendant. Defendant was not given *Miranda* warnings.

7

Every new inmate is asked the same questions, pursuant to a standard form.  The questions are asked for safety and housing purposes.  The form includes questions about gang affiliation.  Corporal Higgins knew that booking information was shared with investigating officers, "[o]n a case-by-case basis, if it is requested . . . ."

During the interview, defendant said he was a member of the 12th Street Hustlers, his moniker was Solo, and he did not get along with the Gateway Posse Crips.

B.    *Discussion*.

"*Miranda* requires courts in criminal cases to exclude, at least from the prosecution's case-in-chief, self-incriminatory statements made by the accused during custodial interrogation unless the accused has knowingly and voluntarily waived . . . the rights to silence and the assistance of counsel.  [Citations.]" (*People v. Lessie* (2010) 47 Cal.4th 1152, 1156.)

In *Pennsylvania v. Muniz* (1990) 496 U.S. 582 [110 S.Ct. 2638, 110 L.Ed.2d 528], four justices of the United States Supreme Court recognized "a 'routine booking question' exception" to *Miranda*.  (*Id*. at p. 601 [opn. of Brennan, J.].)  They described the exception as applicable to "questions to secure the 'biographical data necessary to complete booking or pretrial services.'" (*Ibid*.)  They cautioned, however, that "'recognizing a "booking exception" to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception.  Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.'" (*Id*. at p. 602, fn. 14.)

8

Another four justices would have held that the answers to routine booking questions are not "testimonial" and therefore not within the privilege against self-incrimination. (*Pennsylvania v. Muniz*, *supra*, 496 U.S. at p. 608 [opn. of Rehnquist, C.J.].) Only one justice would have held that the admission of answers to such questions violated *Miranda*. (*Id*. at p. 608 [dis. opn. of Marshall, J.].) Accordingly, the routine booking question exception "is now settled. [Citations.]" (*People v. Williams* (2013) 56 Cal.4th 165, 187.)

In *Gomez*, this court held that a defendant's statement at booking that he was affiliated with a particular gang was admissible under the routine booking exception. There, a jail classification officer testified that every new inmate is asked, among other things, whether he is affiliated with a gang. (*People v. Gomez*, *supra*, 192 Cal.App.4th at p. 626.) The officer added that the booking questions are asked "are asked for the safety of the inmate and the custodial staff" and "'for housing purposes.'" (*Ibid*.) The officer was not involved in investigating any crime that the defendant was charged with. (*Ibid*.) We concluded that the routine booking question exception applied because "the record in this case does not indicate that the questions about gang affiliation were designed to elicit an incriminating response." (*Id*. at p. 627.)

We stated: "In determining whether a question is within the booking question exception, courts should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information. [Citation.] Courts have considered several factors,

9

including the nature of the questions, such as whether they seek merely identifying data necessary for booking [citations]; the context of the interrogation, such as whether the questions were asked during a noninvestigative clerical booking process and pursuant to a standard booking form or questionnaire [citations]; the knowledge and intent of the government agent asking the questions [citations]; the relationship between the question asked and the crime the defendant was suspected of committing [citations]; the administrative need for the information sought [citations]; and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the guise or pretext of seeking routine biographical information [citations]." (*People v. Gomez*, *supra*, 192 Cal.App.4th at pp. 630-631.) However, "[t]he fact that the information gathered from routine booking questions turns out to be incriminating does not, by itself, affect the applicability of the exception. [Citations.]" (*Id*. at p. 629.)

We concluded that, in the case before us: "The questions appear to have been asked in a legitimate booking context, by a booking officer uninvolved with the arrest or investigation of the crimes, pursuant to a standard booking form. . . . [T]he questions were asked for legitimate, noninvestigatory purposes related to the administration of the jail and concerns for the security of the inmates and staff. Significantly, there is no evidence that [the officer] had any knowledge of the crimes for which defendant was arrested or was suspected of committing." (*People v. Gomez*, *supra*, 192 Cal.App.4th at p. 635.)

10

Here, identically, the crucial questions were asked in a legitimate booking context, pursuant to a standard booking form, for legitimate administrative purposes. There was no evidence that any of the booking officers were aware of the charges against defendant.[3] Accordingly, *Gomez* is controlling.

Defendant argues that *Gomez* is distinguishable because here there was evidence that "law enforcement routinely accessed the information . . . ." However, this does not mean that the questions were "'*designed* to elicit incriminatory admissions'" so as to fall outside the routine booking question exception. (*Pennsylvania v. Muniz, supra*, 496 U.S. at p. 602, fn. 14, italics added.) To the contrary, the evidence showed that the questions on the form questionnaire, including the questions about gang affiliation, were designed to and did in fact serve legitimate administrative purposes. As we noted in *Gomez*, the mere fact that the information is incriminating does not prevent it from coming within the exception. (*People v. Gomez, supra*, 192 Cal.App.4th at p. 629.)

Defendant also argues that an inmate's admission of gang affiliation is essentially compelled, because the only alternative is to risk being placed in a cell with a rival gang members. This is not really an argument that his statement was inadmissible under *Miranda*; it is an argument that his statement was inadmissible because it was coerced.

---

[3]     At the first evidentiary hearing, there was some evidence that the officers were aware of the charges against defendant. However, the evidence also showed that, except when he was booked in this case, there were no gang charges or allegations against him.

11

However, he forfeited this argument by failing to raise it below. (*People v. Ray* (1996) 13 Cal.4th 313, 339.)

We therefore conclude that the trial court correctly admitted defendant's statements in the booking interviews. Separately and alternatively, however, we also conclude that the admission of the statements was harmless beyond a reasonable doubt. "[W]e must ultimately look to the *evidence* considered by defendant's jury under the instructions given in assessing the prejudicial impact or harmless nature of the error." (*People v. Harris* (1994) 9 Cal.4th 407, 428.) Here, there was overwhelming evidence that defendant was a member of the 12th Street Mafia and that his moniker was Solo. (See part I, *ante*.)

Defendant tries to suggest that his booking admission on February 14, 2011, the day of the shooting, was the only evidence that he was a current, rather than a former, gang member. But not so. He continued to have photographs of himself throwing gang signs on his cell phone and on Facebook. He continued to have posts on his Facebook page indicating that he was a gang member. And on the very day of the shooting, he texted "G12D" to mean "good."

To turn defendant's argument around, his own statement to police that he was a *former* gang member was the *only* evidence that he was *not* a *current* gang member. And this statement had no credibility, given that he had a reason to lie, given that he also lied about committing the shooting, and given that he did not explain *why* he had supposedly just quit the gang. Accordingly, we are convinced beyond a reasonable doubt that, even

12

if the trial court had excluded defendant's booking statements, the jury would have found that he was a gang member.

## IV

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI _____

J.

We concur:

McKINSTER _____

Acting P. J.

KING _____

J.