Filed 1/16/15  P. v. Harper CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057649 |
| v. | (Super.Ct.No. RIF10006084) |
| WALTER LEE HARPER, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard T. Fields, Judge. Affirmed with directions.

Robert Franklin Howell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant, Walter Harper, of attempted willful, deliberate and premeditated murder (Pen. Code, §§ 664/187),[1] during which he discharged a firearm, causing great bodily injury (§ 12022.53, subd. (d)), possession of a shotgun by an ex-felon (§ 12021, subd. (a)(1)), possession of a rifle by an ex-felon (§ 12021, subd. (a)(1)), possession of a destructive device (§ 12303), possession of ammunition by an ex-felon (§ 12316, subd. (b)(1)), and active participation in a criminal street gang (§ 186.22, subd. (a)). As to the attempted murder and the firearms possessions, the jury made true findings that these crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)). In bifurcated proceedings, defendant admitted suffering four prior convictions for which he served prison terms (§ 667.5, subd. (b)), one serious felony conviction (§ 667, subd. (a)) and two strike priors (§ 667, subds. (c) & (e)(2)(a)). He was sentenced to prison for 25 years to life, plus three 15 years to life terms, plus 13 years, four months. He appeals, contending that evidence was improperly admitted and insufficient evidence supports his convictions. We reject his contentions and affirm, while directing the trial court to correct errors in its minutes and the abstracts of judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1. *The Attempted Murder, Active Gang Participation and Gang Enhancements as to the Attempted Murder and Firearms Possessions*

A Riverside Police Department officer, who had spent almost all of his 13 years on the force in the Casa Blanca neighborhood of Riverside, testified that in February 2010, Raymond Howard, a member of 2800 Blocc Crips (2800), had been murdered by an Hispanic man who was powerful in either the Evans Street gang or the Fern Street gang on Evans Street turf. The officer had heard on the street that Howard's killer had been collecting taxes, presumably, for the Mexican Mafia, and Howard was killed because he had refused to pay them. The killer disappeared after the murder. Before this murder, ninety-nine percent of the crime in Casa Blanca had been a result of fighting between members of a clique of Fern Street and members of Evans Street. While there had been minor flare ups between 2800 and Fern Street or Evans Street, there had been nothing major. However, after Howard's murder, 2800 members were, for the first time, seen in enemy territory, including Evans Street turf, which suggested to the officer that 2800 members were out looking for someone and there was going to be retaliation. Based on the officer's training and experience, he opined that if a 2800 member had been killed by either a member of Evans Street or Fern Street, he would expect a retaliation, which would target the killer, but if the killer could not be located, another member of the

---

[2] There were several instances during this trial where the trial court and the parties failed to put on the record the exhibit number for a recording which was being played for the jury. Greater care should be taken to insure that there are no such ambiguities in the record.

gang would be targeted. He testified that all members of Evans Street lived in Casa Blanca and were highly visible there, while members of the clique of Fern Street were not. The officer testified that the victim of the instant attempted murder was a member of Evans Street. He said that defendant was considered to be one of the leaders or "shot callers" of 2800. By October 29, 2010, he had heard from people in the community the identity of the person who had shot the victim.

The victim testified to the following: He was a years-long member of the Evans Street clique of the Casa Blanca gang.[3] In the Casa Blanca neighborhood of Riverside, there are three gangs—Evans Street, Fern Street and 2800. Evans Street's biggest rival was Fern Street[4]—if Fern Street members came into Evans Street turf, something bad, like an assault, would happen. Although 2800 members were not rivals with Evans Street, they did not hang out in Evans Street turf. Admitted not for its truth, but to explain what the victim did after receiving the information, someone in Evans Street told the victim that Howard, a 2800,[5] had been killed in Evans Street turf, which created a problem between Evans Street and 2800.[6] Months before he was shot, the victim had

---

[3] The prosecution's gang expert corroborated this.

[4] The prosecution's gang expert corroborated this.

[5] The prosecution's gang expert testified that Howard was at least an associate of 2800, and was, perhaps, a soldier of the gang.

[6] The prosecution's gang expert testified that one of 2800's rivals was Casa Blanca Rifa, which was composed of Evens Street and Fern Street. He also testified that

*[footnote continued on next page]*

4

been told by fellow gang members to watch out for defendant, who was associated with 2800, because defendant was running around, looking for people and doing things in the neighborhood that put Evans Street on alert.

On June 25, 2010, at 10:30 p.m., the unarmed victim went to a park in Evans Street turf to look for his younger sister. He noticed an old small white truck with a blue stripe on the side, similar to a truck that was parked next to defendant's parents' house four days[7] later, pass slowly in front of him from a distance of 8-10 feet. The victim saw two people inside the truck, one of whom he thought was defendant, whom he had seen about two times before. The two gave the victim mad looks and the truck sped up, then made a u-turn and approached the victim slowly from behind. The truck stopped 8-10 feet in front of the victim and the victim was positive[8] that defendant was in the driver's seat, while another person was in the passenger seat. Sixteen to eighteen inches of a

---

*[footnote continued from previous page]*
before Howard's murder, there was a relative truce between 2800 and Evans Street and Fern Street.

[7] Defendant's friend testified that he and defendant lived at defendant's parents' home in June 2010 and the friend owned a white Toyota truck with a brown stripe, which was parked in the driveway of an abandoned house next door to defendant's parents' home on June 29, 2010. The friend testified that he told the police on December 17, 2010, that he "drives" the truck, but he leaves the keys anywhere in defendant's parents' house. He later testified that a particular member of the household would usually pick the keys up and lock them in his bedroom. He also testified that the truck had been inoperable all of 2010 and he had it towed to the Hills Street residence (see facts concerning possession convictions) because it was going to be ticketed at the house next door to defendant's parents' house.

[8] Besides twice testifying that he was positive, the victim added that out of a range of one through ten, his identification of defendant was a ten.

single barrel shotgun came out of the driver's window, pointed at the victim, and one shot was fired, hitting the victim's right arm with bird shot.  The truck sped off.  The victim refused to co-operate with the police at the hospital after the shooting, did not tell them who had shot him and refused to look at pictures shown him of possible shooters, although he told his family and friends who had done it and people in the community were aware of the shooter's identity.  On October 29, 2010, the victim, who was on probation, was caught with a gun, which he had been carrying for protection, by the afore-mentioned Riverside Police officer and he was arrested.  By then, the victim was out of the Evans Street gang.

A recording of the post-arrest interview of the victim by two detectives was played for the jury.  In it, one of the detectives said they would later discuss the victim receiving their help for possessing the gun depending on what information the victim had.  The other detective immediately asked the victim who had shot him in June 2010.  The victim said if the detectives helped him out, he would help them out.  The victim told the detectives that in June 2010, while he was looking for his younger sister, a white and blue 1990's small truck with a long bed had passed him with two African-American men inside, who looked at the victim "crazy."  The victim was somewhat reassured by what he had been told, i.e., that members of Evans Street had talked to members of 2800, who said that their fellow gang member had been killed by Fern Street, not by Evans Street.  However, the victim knew that 2800 would "turn it into a racial thing"[9] and they would

---

[9] Fern and Evans were Hispanic gangs and 2800 was an African-American gang.

have a hard time finding a member of Fern Street to retaliate against, so they would come after someone in Evans Street, who was much easier to find. The victim reported that the truck did a u-turn and returned quickly to where the victim was, then slowed down and a sawed-off shotgun came out of the driver's rolled down window. The shooter, who was also the driver, was a 2800 member, was someone the victim recognized as a person he had seen before and was someone who "everyone [said] . . . if anyone's go[ing to] . . . do anything, . . . it'd be him." After one of the detectives assured the victim that they would not "tell the streets" that the victim had talked and that the victim could face 15 years on the gun possession, and the other detective said that the victim would not be released from custody unless he told them something serious, like who murdered someone, and depending on what the victim told them, they would talk to the prosecutor about how helpful the victim was,[10] the victim identified his shooter as "Wally."[11] The victim went on to describe his shooter as being a 5-foot, 11-inch African-American with a ponytail in his mid-to-late-thirties, whom the victim had seen previously on the streets.[12] The victim described the passenger and said he was a 2800, whom the victim had also seen before. The victim said he had been hit with birdshot. The victim told the detectives about two other incidents in which he was involved. One of the detectives told the victim that the

---

[10] This detective testified that neither he nor the other detective talked to the prosecutor about the victim's case.

[11] Defendant's given name is Walter.

[12] During argument to the jury, the prosecutor represented, without objection by defense counsel, that this description matched defendant.

prosecutor would give the victim the best deal possible, but not without help for more than one case—and the bigger the case, the more help the victim would get. The victim was told that he would get time for the gun possession depending on what help he gave, but it was reiterated that the victim could not go home that night. The victim said that he, and other Evans Street members did not like the man who was suspected of killing Howard and he implied that this man was from Fern Street. The victim was shown a photo lineup which contained a picture of defendant, but he said he didn't recognize anyone in it, then he eliminated the pictures of two of the individuals[13] in the lineup, and said that the shooter was not present in it.

The victim testified at trial that he did not pick defendant's picture out of the photo lineup even though he knew defendant was the shooter. He denied telling the detectives what he told them just to tell them what they wanted to hear. One of the detectives testified that when the victim saw defendant's picture in the photo lineup, all the color went out of the victim's face, he breathed heavily and his eyes fixated on the picture. The detective feared that the victim was going to vomit.

The victim testified that after he failed to pick out defendant's picture in the photo lineup, he was taken to a holding cell and he knew he was under arrest. Just before he was transported to county jail, he asked to speak to the police officer who had arrested him that night for possessing the gun. He told this officer and another that he saw who

---

[13] These were not pictures of the defendant.

8

had shot him[14] and that person's name was Walt.[15] He said he had not picked defendant's picture out previously because he was scared, but he was willing to identify the shooter now to stop the shooter from hurting anyone else. After saying he wanted to help the police out so they could help him out, the victim told the latter officer and a detective that defendant had shot him and he circled defendant's picture in the photo lineup. The victim testified that no one told him to pick defendant's picture and he had no personal beef with defendant. The gun possession case, which was the victim's first as an adult, resulted in the victim pleading guilty to a strike, admitting a gang enhancement and receiving five years probation, with local time.[16] The victim denied receiving any deal on the possession case for identifying defendant[17] as his shooter and he had already pled guilty by the time he testified at the preliminary hearing in this case, during which he also identified defendant as the shooter. He denied receiving anything for his trial testimony.[18]

---

[14] The former officer testified that the victim told him that the victim saw the person who shot him in the photo lineup.

[15] See footnote 11, *ante*, page 7.

[16] At the time, a juvenile gun possession case and a juvenile case involving the victim throwing a laptop at a store clerk were pending against the victim. The case agent testified that it was not unusual for a first time adult gun-possessor to receive probation.

[17] The case agent, who was the detective who had questioned the victim on October 29, 2010, confirmed this.

[18] See footnote 10, *ante*, page 7.

A recording of the resumed interview between the detective, the latter officer and the victim, during which the victim picked defendant's picture out of the photo lineup,[19] was played for the jury. The victim explained that he had not earlier picked out defendant's picture because he was afraid defendant would try again to kill him.

The victim testified that in August 2010, he and other Evans Street members had been shot at during a confrontation with Fern Street members and members of a Fern Streets clique.[20]

The prosecution's gang expert testified that the man suspected of being Howard's killer was in prison, but had never been arrested for the murder.[21]

Other evidence concerning these crimes and enhancements will be discussed below.

2. *The Firearms/Ammunition/Destructive Device Possessions*

A Riverside Police Department officer testified that on December 17, 2010, he surveilled a residence on Hill Street in Mira Loma and saw defendant come out of it and re-enter it, then saw defendant's girlfriend enter it and leave it with defendant. The same day, defendant's friend's truck, which the victim had testified was similar to the truck that had been driven by defendant on June 25, 2010, was parked 50 feet outside the Hill

---

[19] The victim said he was 100 percent sure the picture was that of the shooter.

[20] The police officer who arrested the victim on October 29, 2010, testified that the victim was involved in a shooting at a drive-in during which someone from Evans Street got shot by someone from Fern Street.

[21] The Riverside police officer corroborated this.

Street residence. Despite initially responding "Yes" to the question, "On December 17 police served a search warrant on the Hill Street address where [defendant] and [defendant's girlfriend] . . . live[d]", the friend later testified that defendant was still living at his parents' house in December, 2010.[22] However, the friend did not contradict the case agent when the latter said on December 17, 2010, that defendant had been living at the Hill Street residence with defendant's girlfriend "for the last months" and he knew that defendant had been staying at that residence, he did not know for how long, but it could have been for five months "give or take."[23] Still, on the witness stand, the friend insisted that he thought the case agent had been asking about the friend's brother, who was a truck driver who stayed at the Hill Street residence between runs.

A neighbor of the Hill Street residence testified that defendant's girlfriend lived there and the neighbor had seen defendant there occasionally. The neighbor had told the police on December 17, 2010, that defendant lived there. A detective testified that this

---

[22] However, the friend conceded that every time the police went to defendant's parents' house after the June 2010 shooting of the victim, which was often, defendant was not there. This included a visit there on June 29, 2010 at 7:00 a.m. The case agent testified that defendant's parents' house was visited by police once a week, on different days of the week, immediately after the June 2010 shooting and the house was placed under surveillance.

[23] The recording is unintelligible at times, but the case agent testified that his recollection of the conversation with the friend was that the latter said that defendant had been at the Hill Street residence for two-to-five months. When defense counsel cross-examined the friend, she said that the friend told the case agent that defendant "was staying [at the Hill Street residence] for a couple of months, or it could have been five months[.]"

11

neighbor described someone who fit defendant's description, and having defendant's first name, as living at the Hill Street residence for six months.

At the residence, an unframed photograph of defendant holding a baby was found in a bedroom closet. The living room of the residence contained Pittsburg Steelers merchandise and there was a Steelers jacket in the kitchen. Defendant had a Steelers logo tattooed on his back. Presents under the Christmas tree were marked for or from "Walt" or "Walt and [defendant's girlfriend's first name]."[24] There was a live shotgun round in a kitchen drawer, and in the hall closet, a loaded 12-gauge pump action shotgun with pistol grip, ammunition in a white canvas tote bag, including that which could shoot bird shot, in a grocery bag, in a small black duffle bag and loose, and in a bedroom that also contained items of dominion and control by defendant's girlfriend, a Marlin .22 caliber rifle in the closet and a cell phone containing pictures of defendant sitting in the living room of the same house and a rifle on the floor of the kitchen. A destructive device was found in the same bedroom closet. Defendant's friend's brother's possessions were in another bedroom.

Defendant's girlfriend testified that the Steelers football team was defendant's favorite team, but the Steelers merchandise in her home belonged to her son, who visited her there three-to-four times per week. She said she and defendant began dating in May 2010, and before she moved to the Hill Street residence, they often stayed in motels, because neither had a place of their own in which to stay. She moved into the Hill Street

---

[24] See footnote 11, *ante*, page 7.

residence in July or August 2010 and lived there, alone, although defendant visited her there at least two times a week during the day. She denied telling the police that defendant had lived with her at the Hill Street residence since Halloween, 2010, and that he stayed there at least five days per week. She said she had one gun in the closet of her bedroom and one in the hall closet, although she admitted telling the police on December 17, 2010, that there were no guns in the house. She did not know what was in the black bag that contained all the ammunition she knew to be in her house and the two guns, but she said she got the bag and its contents from her cousin, who later killed himself.[25] She denied knowing how to use guns or ammunition. She did not recall there being pictures of a gun on the cell phone that was found in her bedroom and she did not recognize several of the other pictures that were on that phone. She had no idea how a shotgun shell got into her kitchen drawer. She did not seem to know about the canvas bag in which ammunition was found.

During a December 17, 2010 police interview with defendant's girlfriend, a recording of which was played for the jury, the girlfriend admitted that all the Steelers merchandise in the Hill Street residence was defendant's, which she had purchased for him. She also admitted that defendant began living at the residence in October 2010, was there five days a week, including nights, and stayed with her most of the time. She denied knowing about the shotgun and ammunition that was in the hall closet, the rifle in

_____

[25] She admitted that she had failed to tell both the police and the defense investigator the origin of these guns, but she claimed she did this to protect her cousin's reputation.

13

the bedroom closet or the pictures of the rifle on the cell phone. When asked if she saw defendant put the shotgun and ammunition in the hall closet, she stated that she was at work all the time. She said she thought the destructive device in the bedroom closet was a candle defendant had made for her, which had been there for two weeks. She stated she had not used the cell phone in three months and did not know what went on when she was at work. She said that based on the tattoos that adorned defendant's body, she concluded that he was a gangster, "from C[asa] B[lanca]." She stated that when the police were following her and defendant as they drove away from the Hill Street residence on December 17, 2010, defendant acknowledged that the police were there for him and he pulled over without the police having to use their sirens or lights.

Defendant could not be excluded as the contributor of the DNA on the Marlin rifle[26] or the shotgun found at the Hill Street residence.

### ISSUES AND DISCUSSION

1. *Admission of Gang Evidence*

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears *of record an objection to or a motion to exclude or to strike* the evidence that was timely made and so stated as to make clear the specific grounds of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the

---

[26] One in 330 African-American males had the same DNA profile.

14

ground stated and that the error or errors complained of resulted in a miscarriage of justice."

California Rules of Court, Rule 8.204(a) states, "(1) Each brief must:  [¶]  . . .  [¶] (C) Support any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."

We quote the above provisions because not once in the 22 pages[27] appellate counsel devotes to the admission of gang evidence in his opening brief does he make an express reference to any instance of defense counsel at trial objecting to any of that evidence, including the nature of the objection and the ruling thereon by the trial court. The closest appellate counsel for defendant comes is his assertion, without any citation whatsoever to the record, that "the [prosecution's] request for admission [of the gang evidence] should have been more carefully scrutinized."[28]  However, counsel does not even go on to assert that any of the evidence he now contests was part of the prosecution's request for admission of evidence or that the trial court had an opportunity to determine whether any of that evidence that is now contested should have been

---

[27]  This constitutes the bulk of the substantive portion of defendant's opening brief.

[28]  As part of our review, we read the Points and Authorities in Support of [the] Motion to Prohibit Opinion Testimony of Gang Expert[s] authored by Deputy Public Defender Judith Gweon, which reads like it was either authored by someone who is not in full command of the English language, or dictated, then typed up by someone who is not in full command of the English language, and not proof-read by someone who is.  Trial courts are busy enough without having to weigh through marginally readable motions. Although to a much lesser degree, Deputy District Attorney Daima Calhoun's Trial Brief could have profited from a good proof-reading.

15

admitted. Appellate counsel for defendant attempts to invoke "bedrock principles" in his opening brief, but the above-cited provisions are just that.

We, therefore, begin with a summary of what evidence was actually contested below, in what way and how the trial court ruled on it.

In his motion below to exclude the testimony of the prosecution's gang expert,[29] defendant asserted that the former should not be allowed to testify absent evidence independent of his testimony to establish that the attempted murder was gang related.[30] The trial court rejected this, finding that the prosecution's gang expert could establish the foundation that it was gang related and the magistrate, at the conclusion of the preliminary hearing, bound defendant over on the gang enhancement allegation and the substantive gang offense, thereby finding that a preliminary showing had been made that the attempted murder was gang-related. During the discussion of the admissibility of the expert's testimony,[31] the trial court cited a case holding that a gang expert may rely and testify to that reliance on "reports written where the defendant was a suspect; times the [expert] contacted the defendant [while he was] in the presence of other gang members; . . . when he [was] caught with a codefendant; . . . being caught [the day a prior

---

[29] This was designated in the People's moving papers as Detective Levesque and no one else although other witnesses at trial offered expert evidence about gangs. In its ruling, the trial court referred to Detective Levesque.

[30] At this point, the parties were focusing on the attempted murder (and, as a consequence, the active gang participation charge) and not the possession charges.

[31] The trial court went into the basis for the prosecution's expert's opinion, not because defendant raised it, but because the prosecutor raised it in her trial brief.

16

offense had been committed by other gang members] with another gang member[;] . . . [¶] . . . when searching a house for a [fellow] gang member . . . who was an attempt[ed] murder suspect, the [expert] found the defendant hiding[;] . . . the [expert seeing] an incident report that indicated that defendant had been present, had a knife [fight] or stabbing . . . involving another . . . member of that gang, although, the defendant had not been charged with any crime in connection with that incident [a]nd . . . [that] the defendant had a number of gang-related tattoos." The trial court cited a California Supreme Court holding that "prior conduct or acts committed at the time of the charged offenses can be used to establish primary activity . . . of [a] gang." The court cited another opinion holding that the expert may "base . . . his opinion . . . on conversations with the defendant and with other Family Crip members, his personal investigations in hundreds of crimes committed by gang members, as well as information from his colleagues in various law enforcement agencies. [¶] . . . [¶] . . . 'Expert testimony may also be premised on material of a type that is not admitted in evidence, so long as it is material of a type that is reasonably relied upon by experts in a particular field forming their opinions. If the threshold question of reliability is satisfied, even a matter that is ordinarily inadmissible can be a proper basis for an expert opinion.'" The trial court concluded that the items of evidence the prosecutor proposed to introduce in this case were the "type that may reasonably be relied upon by experts" and this included offenses committed by defendant and other 2800 members, the effect those crimes had on enhancing the reputation of the gang, defendant's contacts with law enforcement between 1994 and 2010 to prove that he was an active member of the gang, his tattoos, the gang

17

graffiti found in his jail cell and a phone conversation he had with a fellow gang member while the latter was in jail. *Defense counsel conceded that the prosecutor could introduce evidence of "the prior contact and the hearsay statements and personal investigation and all the items that the Court just indicated to form an opinion . . . ."*

Defendant moved in a separate motion to exclude his booking statements admitting that he was a member of 2800 on the basis that his statements were in violation of *Miranda*.[32] The trial court concluded, under *People v. Gomez* (2011) 192 Cal.App.4th 609 [Fourth Dist, Div. Two], that unless there was evidence that the admission of gang membership had not been sought as part of the ordinary booking process, for which there are legitimate reasons related to inmate and jailer safety, but for purposes of incrimination, it was admissible. Defense counsel then argued that admission of these statements was fundamentally unfair to defendant, which appeared, due to its context, to be more of an assertion that it is not fair to use a defendant's statements during booking against him later in another trial, rather than an argument under Evidence Code section 352. The trial court ruled the statements were admissible.

Defendant also moved separately to exclude evidence of his 2006 prior conviction of assault with a firearm as a predicate offense. The trial court granted this motion, finding that there were plenty of other predicate offenses committed by other 2800 members, therefore, the probative value of the evidence was outweighed by its prejudicial impact. However, the prosecutor then sought admission of the evidence on the basis that

---

[32] *Miranda v. Arizona* (1966) 384 U.S. 436.

during the 2006 crime, defendant invoked 2800, and since the prosecutor had to prove that at the time of the charged offenses, defendant was an active member of 2800, and defendant had gone to prison for this conviction and the charged crimes occurred less than a year after he was released, the evidence was probative. The trial court agreed and ruled that the evidence was more probative than prejudicial.[33]

Defendant then moved orally to exclude evidence that 2800 graffiti had been found in the jail cell he had occupied while awaiting trial in this case on the basis that because there was another occupant of the cell, the foundation for admission of the evidence could not be laid.[34] The trial court ruled that while defendant could argue that he didn't put the graffiti there (that his cellmate did), the evidence was admissible.

Finally, defendant moved to exclude a recording of a March 23, 2010 jail phone call made by another 2800 member to defendant on the basis that is difficult to tell who is saying what during the conversation. The People represented that the two discussed the death of their fellow gang member (Howard), whom they believed had been killed by a particular member of the victim's gang, and who they were looking for to avenge the death. The People also represented that a deputy who had spoken to defendant at length

---

[33] Contrary to the People's assertion, defendant did not object to this evidence for this purpose on the basis of the remoteness of the acts. That argument pertained only to their assertion that the conviction should not be used to impeach defendant should he choose to testify.

[34] Defense counsel stated, "Since there were two people in the cell and . . . gang-related graffiti [was] found, I just don't believe a foundation is met that those graffiti belonged to [defendant]." Therefore, we disagree with the People's characterization of defendant's objection below as one of relevance.

and listened to hours of his jail phone conversations, could identify the latter's voice on the recording and the call began with the jailed 2800 member asking for defendant by his first name and his moniker. The trial court concluded that the evidence was relevant because it tended to show motive and that defendant was an active member of the gang and sufficient foundation had been established.

It is against this background that the first prosecution witness, the victim, began the People's case-in-chief, testifying, without objection by the defense, inter alia, as an expert about his gang and defendant's. For defendant to assert that no evidence other than defendant's admission of his membership in 2800 on December 17, 2010[35] and the fact that he had 2800 tattoos was necessary[36] to prove his membership is disingenuous.

_____

[35] Defendant gets it completely wrong when he asserts that defendant admitted his membership to the Riverside police officer heretofore mentioned. The officer never so testified, which is probably why defendant's assertion is not accompanied by a citation to the record.

[36] Although defendant complains about this officer testifying that defendant was a leader and shot caller in 2800, we note with interest that it was *defense counsel* who, on cross-examination of the officer, asked him the leading questions whether defendant was both (defense counsel also asked if defendant was a "big fish" in 2800), to which the officer responded in the positive. The prosecutor, during her direct examination of the officer, had not broached the subject of defendant's membership in 2800. Defendant fails to mention this in his opening brief.

When the prosecution's gang expert testified that defendant admitted during a December 17, 2008 interrogation that the latter was a member of 2800, the trial court instructed the jury to not consider this evidence for the truth of the matter asserted therein, but only as the basis for the prosecution expert's opinion that defendant was a member of 2800.

Finally, as we often see in gang cases, tattoos are not always indicative of *continuing* membership in a gang because they are permanent, unless removed via painful and expensive laser treatments, which most former gang members cannot afford. Because the prosecutor had to prove that during the June 2010 attempted murder and

*[footnote continued on next page]*

As the prosecutor pointed out during the pretrial discussions, summarized above, defendant's membership in 2800 or, as applies to this particular case, his membership on June 25, 2010 and December 17, 2010,[37] was not all she had the burden to prove. Defendant's argument also ignores what actually happened at this trial. After defendant conceded that the items he now claims should not have been admitted were admissible, objected only to the admission of his booking statements concerning his membership on the basis that it was fundamentally unfair to him, and to the admission of evidence about the jail cell graffiti and the jail phone conversation on the basis of foundation, the victim gave his testimony about the conflict between 2800, of which defendant was associated, and Evans Street, opining, in the process, that it was the reason defendant shot him, all without objection by the defense. The next witness of substance was the Riverside police officer, heretofore mentioned, who said nothing about defendant or 2800 during his direct examination by the prosecutor. However, during cross-examination *by defense counsel*, *in answer to leading questions by defense counsel*, he testified that he considered defendant one of the leaders, "shot callers" and "big fishes" of 2800. Additionally, defense counsel solicited from the officer more information about the murder of Howard. This, in turn, opened the flood gates for the prosecutor to ask the officer on redirect more about the murder, which lead to the first mention at this trial of the Mexican Mafia,

---

*[footnote continued from previous page]*
active participation in a gang and during the December 2010 gun possessions, defendant continued to be a member of 2800, the tattoos would not have sufficed.

[37] See the last paragraph of footnote 30, *ante*, page 17.

unobjected to below by the defense, which defendant now cites as a further example of the prejudice to which he was exposed at trial. Under the circumstances, for defendant to appear outraged that evidence of his gang membership apart from his December 17, 2010 admission and the tattoos on his body was admitted is preposterous.

Under the guise of reiterating the foundational objection he made below to the evidence that there was 2800 graffiti in the jail cell he occupied pending this trial, defendant's sole assertion is that, "[t]he only probative value of the graffiti evidence was to inform the jury that [defendant] was considered dangerous enough to be taken off the street and kept in a nasty jail cell for over one and one-half [years] between his arrest and trial, with either no bail or too high a bail to post to obtain his release." On direct examination, the prosecution gang expert was asked what information he had that defendant was a 2800. He responded, inter alia, that 2800 graffiti had been chipped into the paint in defendant's cell and on a desk inside it, and photos of this were shown to the jury. The prosecutor never solicited (nor did defense counsel) from the witness how long defendant occupied that cell, so defendant's current objection that defendant was in the cell from arrest to trial is based on pure speculation. We have already addressed defendant's argument that there was no need for the prosecutor to solicit further evidence that defendant was a 2800 member because defendant admitted it on December 17, 2010 and had 2800 tattoos. During cross-examination by defense counsel, it was brought out that the witness did not know how long the graffiti had been there, that defendant had cellmates and it was not known how many he had, that the jail tended to house together inmates of the same gang, and the witness did not know for certain who created the

graffiti. Thus, the foundational issue defendant asserted below was brought to the jury's attention. Despite this, defense counsel conceded during argument to the jury that defendant was a 2800 member and argued that because the victim had told the case agent that Howard's killer was a member of Fern Street, and the victim was a member of Evans Street, defendant had no motive to attempt to murder the victim, therefore, he was not guilty of either that crime or the substantive gang crime. As the trial court below concluded, a foundational issue is not a legitimate reason for excluding the evidence. Evidence Code section 403, subdivision (a) (4) provides, in pertinent part, "The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when: [¶] . . . [¶] (4) The proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person . . . so conducted himself." "'The [trial] court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury. . . . The decision whether the foundational evidence is sufficiently substantial is a matter within the [trial] court's discretion.'" (*People v. Rundle* (2008) 43 Cal.4th 76, 129, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Defendant does not even here assert that the trial court abused its discretion in finding that there was sufficient foundation that defendant was the person responsible for the graffiti in his cell in order to admit the evidence. Moreover, the jury was instructed as follows, "You may consider evidence of gang activity only for the limited purpose of

23

deciding whether: [¶] The defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes and enhancements; [¶] The defendant had a motive to commit the crimes charged; [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information to rely on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

As already stated, defendant's sole objection at trial to the admission of the recorded jail conversation between him and another 2800 member was foundational. Here, defendant, by misinterpreting evidence, asserts that admission of the recording was outrageously prejudicial to him, a matter he waived below by failing to object on this basis. However, because the argument in defendant's opening brief is so inflammatory in nature, we will examine the conversation and the expert testimony concerning it.

The substance of the conversation is very difficult to discern and requires, at times, heavy dependence on the prosecution's gang expert's interpretation of it. In it, a jail inmate, who previously during trial had been identified as someone defendant had told police on December 17, 2010 was running 2800 with him, called defendant, who previously during trial, *thanks to defense counsel*, had been identified as a leader, shot caller and big fish of 2800. Defendant told his fellow leader that a member of Evans Street had told him that that member, or some third person, and the man suspected of killing Howard had been taxing Howard when things went badly and Howard was killed.

24

Defendant's fellow leader told defendant that he did not trust this Evans Street member and he had told defendant that while in prison. They discussed this person being on the outs with members of his own gang, the activities of the law enforcement gang task force in the neighborhood and they traded information about the activities of a Moreno Valley gang and an assault near Riverside Community College on two Hispanics. Defendant complained that he had only one person who could be relied upon to put in work, meaning to commit crimes for the gang. Defendant's fellow leader told defendant that the latter needed to get the younger members of 2800 who weren't doing what they were supposed to be doing to be more productive.[38] Defendant told his fellow leader about an incident involving two 2800 members about which the Riverside police officer had already testified. They discussed how one of these two members was messing up. According to the prosecution gang expert, they also discussed throwing this member out. When defendant complained about "a bunch of little shit going on"[,] the fellow leader told defendant, "[Y]ou need to get all that shit out of the way" and defendant agreed. According to the prosecution's gang expert, they were trying to get their house in order in light of the impending battle with people that used to be part of a truce with them. According to that expert, they also discussed finding the suspected killer of Howard. They then discussed a member of Fern Street who had been convicted of numerous

---

**38** The prosecution's gang expert added context to this part of the conversation by saying that defendant and his fellow 2800 member indicated that they knew that a battle was heating up between 2800 members and those with whom they formerly had had a truce, that the younger members of 2800 had never had to deal with this before and that it was time to clean house.

crimes and sent to prison for many years after giving the fellow gang leader information about the suspected killer of Howard while both had been in the jail. The fellow leader told defendant something about a gang shot caller inside the jail who had put a green light on him, meaning that the fellow leader would be killed.

The prosecution's gang expert went on to testify that the reason the member of Evans Street who talked to defendant about Howard's murder had a relationship with the defendant involved "some mid to high level politics of gang culture." He opined that this Evans Street member was "supposedly also a tax collector . . . [a]nd at one point possibly an associate of the Mexican Mafia." He went on to explain that the Mexican Mafia control all the street gangs and sales of drugs, and "when you get to a certain level, the [Mexican Mafia are] no longer are concerned with what [clique] you're from. They don't care if you're from Evans Street or Fern. The Mexican Mafia wants their money." He said that the Evans Street member collected taxes for the Mexican Mafia with someone who might be from a rival gang, and if they did not, they would be killed. He added that there had been a rumor that the Evans Street member had been targeted for death by the Mexican Mafia for a long time because he was collecting taxes on his own, without the Mexican Mafia's authorization, and that was why he was eventually killed. All the evidence came in without objection by the defense.

Defendant here asserts that the conversation included statements to the effect that before the Evans Street member died, defendant was also trying to find him, and "that [defendant] was waiting to receive some 'paperwork' from the Mexican Mafia." Defendant completely misinterprets that portion of the conversation to which he refers

26

and the prosecution gang expert's explanation of it. The expert testified that at the beginning of their conversation, the fellow leader seemed to be trying to figure out where the Evans Street member was, so the latter could be questioned about Howard's murder, but defendant interrupted him and told him that he has already spoken to the Evans Street member, who told him about the murder, as reported above. After defendant explained to the fellow leader why Howard had died, he added, "Yeah, I'm still waiting on the . . . paperwork" which the gang expert testified meant court documents and police reports that gang members check to see who is talking about the crimes or who the witnesses are and what happened.[39] There was no reference whatsoever during this part of the conversation to the Mexican Mafia. For defendant to assert that during this passage (or any other, for that matter), there was an implication that he was "acting, or at least prepared to act, as a contract killer for the Mexican Mafia, for the specific purpose of murdering [Howard's killer] and [the Evans Street member]" is patently absurd.

Defendant next asserts that the prosecution gang expert's testimony that on six different occasions between February 19, 1994 and December 17, 2010, defendant admitted being a 2800 member while being booked into jail, and that his fellow leader had been convicted of discharging a firearm and other crimes, "including a gang allegation" based on acts occurring on a particular day "demonstrate[d] to the jury that

---

[39] Defendant misreads the record when he asserts that it also refers to money. The expert testified that a later reference in the conversation to "paper" (not "*paperwork*") was to money, and it involved the fellow leader telling defendant to get gang members to get some money so it could be put on the books at jail for his use in the commissary.

not only had [defendant] personally and consistently broken the law and committed numerous crimes for which he had been arrested and jailed over a period of more than 13 years, but that he was also the co-leader with [someone], who also had an impulsive and violent character." However, the jury had been instructed by the trial court to use defendant's booking admission only as the basis for the expert's opinion that defendant was a 2800 member, therefore, the jury could not possibly have used them to conclude that defendant had committed numerous crimes for which he had been arrested and jailed. As to the fellow leader's convictions, the People were obliged to prove that 2800 members "have engaged in a pattern of criminal gang activity" in order for the jury to make true findings as to the charged gang allegations and active gang participation offense and the expert limited his testimony in that regard to this subject. Additionally, defendant made no objection below to this latter evidence, therefore, he waived the matter.

Defendant also now makes the same complaint about evidence of his "in field" admissions of membership in 2800, however, he not only conceded below that this was admissible, as already stated, but the trial court instructed the jury that it could use this evidence only as the basis for the expert's opinion that defendant was a 2800 member.

Finally, defendant complains that evidence that in 2006, he confronted someone over a sign of disrespect, during which he pointed a handgun at the person and made a reference to 2800, for which he was arrested, should not have been admitted. The trial court concluded that this evidence was more probative than prejudicial to show that defendant was an active member of 2800, despite his age, which would in the gang

28

culture be considered to be advanced for a gang member. Defendant did not actually object to the admission of this evidence *for this purpose*, therefore, his current claim that admission of this evidence violated Evidence Code sections 1101 and 352 was waived. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408.) To the extent one wishes to impute an Evidence Code section 352 objection to the defense, due to the trial court's agreement with the prosecutor's argument that the evidence was more probative than prejudicial to prove defendant's continuing participation in 2800, we are not persuaded that the trial court abused its discretion in this regard. The prosecutor represented below, without contradiction by the defense, that defendant went to prison for the 2006 crimes, and was out less than a year when he committed the instant crimes. Given defendant's advanced age, in terms of gang culture, we cannot conclude that admission of this evidence for the purpose of proving defendant's continuing participation in 2800 exceeded the bounds of reason.

As we have already stated, defendant, during argument to the jury, conceded that he was a 2800 member and it was defense counsel, himself, who initially solicited testimony that defendant was a leader, shot caller and big fish in the organization. The real issue in this case, as to the charged attempted murder and active gang participation and, as a foundational matter, the gang enhancement allegations, was the identity of the victim's shooter, which, essentially boiled down to the credibility of the victim and that of defendant's friend, who claimed that his truck was inoperable during 2010. In fact, defense counsel used the fact that defendant was a shot caller in 2800 to imply that the

police unfairly targeted defendant as the victim's shooter, as evidenced in the March 23, 2010 jail call.

Defendant asserts that even if admission of this evidence did not violate state law, he is entitled to relief if it is so prejudicial that it renders the trial fundamentally unfair. We disagree with defendant that admission of this evidence rendered his trial fundamentally unfair. Defendant cites no authority holding otherwise. In fact, it was typical of evidence admitted in gang cases. "[W]hen no specific federal constitutional challenge to the evidence was raised below, . . . appellate claims" "that the trial court's asserted evidentiary errors deprived them of due process under the federal Constitution . . . are preserved only to the extent that the federal aspect is a gloss on the claim of error actually raised. [Citation.] . . . [E]very state law error does not automatically result in a violation of the federal Constitution . . . (*People v. Cudjo* (1993) 6 Cal.4th 585, 611 . . . ['for the most part . . . the mere erroneous exercise of discretion under such "normal" rules [of evidence] does not implicate the federal Constitution']; *Engle v. Issac* (1982) 456 U.S. 107, 121, fn. 21 . . . ['We have long recognized that a "mere error of state law" is not a denial of due process. [Citation.] If the contrary were true, then "every erroneous decision by a state court on state law would come [to this Court] as a federal constitutional question."']).)" (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th 335, 413, fn. 34.) Moreover, defendant waived the matter by failing to assert it below, except as to the booking statements.

Defendant also contends that admission of the foregoing evidence as the basis for the prosecution gang expert's opinion violated his right to confrontation. At the same

time, he concedes that we are bound by California Supreme Court precedent holding otherwise (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th 335, 413; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) and he asserts that he raises the issue only to preserve his right to relitigate it later in federal court. We also note that defendant waived his complaint by failing to object to this evidence below on the basis of confrontation. (*Ibid*.)[40]

2. *Sufficiency of the Evidence*

      a. *Active Participation in a Criminal Street Gang*

The jury was instructed that in order to convict defendant of this charged offense, the People must prove that: "the defendant actively participated in a criminal street gang[, [¶] . . . [w]hen the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity . . . and [¶] . . . the defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by . . . [¶] [d]irectly and actively committing a felony offense . . . or [¶] [a]iding and abetting a felony offense. [¶] . . . [¶] Felonious criminal conduct means committing or attempting to commit any of the following crimes: [¶] [a]ttempted murder as charged in Count 1." The parties argued to the jury that the felonious criminal conduct was the attempted murder.

A few months after this trial took place, the California Supreme Court, in *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132, 1134, held that in order to convict a

---

    **40** During the latter part of his argument, defendant incorrectly refers to Howard as Thomas.

31

defendant of actively participating in a criminal street gang, the People must also prove that the "felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member . . . [¶] . . . [¶] 186.122(a) . . . require[es] that a person commit an underlying felony with at least one other gang member." In *Rodriguez*, the evidence indisputably established that the defendant acted alone. (*Id*. at pp. 1128, 1131.) Defendant contends that there was insufficient evidence that the passenger in the truck was a member of 2800 or any gang. We disagree.

There was evidence from which a reasonable juror could have concluded that the passenger in the truck with defendant on the night of June 25, 2010 was a fellow 2800 member. Specifically, there was more than sufficient evidence that the motive for the attempted murder was retaliation for the killing of Howard. The victim testified that when the occupants of the truck passed him the first time, they looked at him crazy or had a mad look on their faces. Although he testified at trial that the passenger was a person he did not know, he told the police that the passenger was a 2800 member, whom he had seen before. The victim testified that the truck drove past him not at a fast pace, went beyond him, then sped up to make a u-turn and return to a position 8-10 feet in front of him, where it either slowed down or stopped and he was shot. He told the police that before defendant fired, the victim thought that the passenger was going to shoot the latter, but defendant told the passenger, "Hand me that shit, hand me that shit" then defendant shot the victim. The prosecution's gang expert testified that the vast majority of gang members will not allow someone else to commit crimes with them unless they are also

members of that gang. The foregoing constitutes substantial evidence supporting an implied finding by the jury that the passenger in the truck was a fellow 2800 member.

b. *Active Participation in a Criminal Street Gang and Gang Enhancements*

As to the enhancements attached to the attempted murder and the firearms possession, the jury was instructed,

"To prove this allegation, the People must prove that: [¶] . . . the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; and [¶] . . . the defendant intended to assist, further, or promote criminal conduct by gang members."

To summarize the testimony already described about the conflict between 2800 and Evans Street or Fern Street preceding the shooting of the victim, the Riverside Police officer testified that after the murder of Howard on Evans Street turf, 2800 members were seen for the first time in places he had never before seen them, i.e., enemy territory, including Evans Street turf, suggesting that they were searching for someone and there was going to be retaliation. Evans Street members were much more visible in Casa Blanca—Fern Street members were not, Howard's killer had disappeared after the killing and it was his opinion that if Howard's killer could not be located, retaliation would be directed at another member of either Evans Street or Fern Street. The victim told police that 2800 members would have a hard time finding a member of Fern Street against whom they could retaliate and they would turn their retaliation into a "race thing" and go after members of Evans Street, who were more visible than members of Fern Street. The victim reported being "mad dogged" by defendant and his passenger just before the

33

shooting. During defendant's phone conversation with his fellow gang leader, a month after Howard's killing, they discussed the reason for the killing, who was suspected of doing it, how this person could be found and that a member of Fern Street had given the fellow leader information about the suspect. The reason defendant offered his fellow leader for the murder of Howard was the same reason about which the Riverside Police Officer testified. It is also clear from the conversation that the two, together, were deciding how 2800 should be administered.

The prosecution's gang expert testified that the murder of Howard heralded a sea-change in the relationship between 2800 and the Hispanic gangs in Casa Blanca and was a slap in the face to 2800. Thereafter, efforts were made by 2800 to find Howard's killer, as evidenced by the phone call between defendant and his fellow leader, but no one, including 2800 and the police, could find him. The police began to notice 2800 members in Evans Street turf, as evidenced by the fact that the Riverside Police Officer saw 2800 members there and caught two of them there, one of whom had a bullet in his pocket. Even though the police were not positive whether Howard's killer was Fern Street or Evans Street, he regularly went into Evans Street turf, where he was eventually arrested. There was no point to 2800 looking to retaliate in Fern Street turf as Fern Street members were not very visible there and few lived there. However, it was easy to find Evans Street members, especially at the park, near where the victim had been shot. The victim's shooting was in retaliation for Howard's murder and not because there was any personal animosity between the victim and defendant. As the people correctly note, no one gave an opinion that the firearms possessions were gang-related.

34

Defendant claims the evidence was insufficient to support the verdict that he was an active participant in a criminal street gang and the gang enhancement connected to the attempted murder[41] because "there was no non-opinion evidence that the shooting of [the victim] had any connection with any gang activity." In support, he cites *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*) and *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*In re Frank S.*), but they are distinguishable. He also cites *People v. Ferraez (*2003) 112 Cal.App.4th 925 (*Ferraez*), which does not support his position.

In *Ramon*, the defendant and a fellow gang member were caught by the police in the heart of their gang's turf driving a stolen truck, which contained an unregistered hand gun that did not belong to the truck's owner. (*Ramon*, *supra*, 175 Cal.App.4th at pp. 846-847.) The prosecution's gang expert testified that the crimes of receiving a stolen vehicle and possessing the gun were related to what he said were the primary activities of the gang because having both would enable gang members to commit those crimes and then get rid of the vehicle and the gun. (*Id.* at pp. 847-848.) He also said that both items could be used to spread fear and intimidation. (*Id*. at p. 848.) The appellate court observed, "[The prosecution's gang expert's] opinion was based on his belief that because the gun and the stolen vehicle could be used to facilitate the commission of a crime, and the [gang] commits crime[s], the two must have been acting on behalf of the [gang]. [¶] . . . [¶] . . . *There were no facts from which the expert could discern whether*

---

**41** As the People correctly point out, because none of defendant's arguments refer to the gang enhancements connected to the firearms possessions, he has waived his argument that the evidence supporting them is insufficient.

[*defendant and his fellow gang member*] *were acting on their own behalf . . . or were acting on behalf of the* [*gang*]. While it is possible the two were acting for the benefit of the gang, a mere possibility is nothing more than speculation. Speculation is not substantial evidence. . . . [¶] The . . . [facts that defendant] was with another gang member, and . . . was in gang territory . . . standing alone, are not adequate to establish that [defendant] committed the crime with the specific intent to promote, further, or assist criminal conduct by gang members. . . . [*T*]*here is nothing in the record that would permit the People's expert to reach th*[*e*] *conclusion . . .* [*that defendant was acting with this specific intent.*] [¶] . . . *The facts on which* [*the prosecution's gang expert*] *based his testimony were insufficient to permit him to construct an opinion about* [*the defendant's*] *specific intent in this case*. His opinion, therefore, cannot constitute substantial evidence to support the jury's finding on the gang enhancement. [¶] . . . [¶] The analysis might be different if the expert's opinion had included 'possessing stolen vehicles' as one of the activities of the gang. . . . [¶] . . . [¶] The . . . cases we have reviewed . . . have not revealed any situation where expert testimony about a possible reason for committing a crime was sufficient, by itself, to establish the crime was committed with the specific intent to promote, further, or assist in criminal conduct by gang members." (*Id*. at pp. 849, 851-853, italics added.) Contrary to defendant's assertion, *Ramon* does not stand for the proposition that more than expert opinion testimony must support a substantive gang conviction and gang enhancements. *Ramon* clearly questioned the substantiality of the expert opinion offered there on the basis that it was not supported by the evidence presented. Moreover, there was more than just the opinion of the prosecution's gang

36

expert in this case to establish the requisites for the substantive gang offense and the enhancement. Finally, the factual differences between *Ramon* and this case are obvious.

In *In re Frank S.*, the juvenile was caught in possession of a dirk or dagger, which he said was for self-protection. (*In re Frank S.*, *supra*, 141 Cal.App.4th at pp. 1194-1195.) The prosecution's gang expert opined that a gang member would use the knife for protection from rival gang members and to assault the same. (*Id.* at p. 1195.) The appellate court that decided *Ramon* held, "[H]ere nothing besides weak inferences and hypotheticals show the minor had a gang-related purpose for the knife. [¶] [T]he expert simply informed the judge of her belief of the minor's intent with possession of the knife, an issue reserved to the trier of fact. . . . [T]he prosecution presented no evidence other than the expert's opinion regarding gangs in general and the expert's improper opinion on the ultimate issue to establish that possession of the weapon was 'committed for the benefit of, at the direction of, or in association with any criminal street gang . . . .' [Citation.] *The prosecution did not present any evidence that the minor was in gang territory, had gang members with him*, or had any reason to expect to use the knife in a gang-related offense. (*Id.* at p. 1199, italics added.) For the same reasons *Ramon* does not apply here, neither does *In re Frank S.*

Finally, in *Ferraez*, the defendant, a self-admitted gang member, was caught with rock cocaine. (*Ferraez*, *supra*, 112 Cal.App.4th at pp. 925, 928.) He denied selling it for the gang in whose territory he was, but he said he had this gang's permission to sell it there. (*Ibid.*) The prosecution's gang expert testified that gang members sell drugs because it involves less risk than other crimes and the profits can be used to buy guns or

more drugs to increase the volume of their business and a member possessing a drug for sale enhances a gang's reputation. (*Ibid*.) Given a hypothetical that incorporated the facts of this case, the expert opined that the drugs were intended to be sold to benefit or in association with a gang, the proceeds could be used to benefit the gang in purchasing guns or more drugs or bailing a member out of jail and the sale of drugs promotes criminal conduct by the gang. (*Ibid*.) The *Ferraez* court observed, "[T]he expert's testimony alone would not have been sufficient to find the drug offense was gang related. But here it was coupled with other evidence from which a jury could reasonably infer the crime was gang related. Defendant planned to sell the drugs in [the] . . . territory [of another gang]. His statements . . . that he received permission from that gang to sell the drugs . . . and his . . . admissions . . . that he was a member of . . . a gang [that was] on friendly terms with [the former gang], also constitute circumstantial evidence of his intent." (*Id*. at p. 931.) In this case, like in *Ferraez*, there was evidence aside from the prosecution's gang expert's opinion, as stated above, from which the jury could reasonably infer that the attempted murder was gang related, therefore, the gang allegation attached to the actual murder was true and he was guilty of the substantive gang charge.

Defendant suggests that there is insufficient evidence because he did not invoke his gang's name during the attempted murder. However, the prosecution's gang expert testified that it was not common for gang members to call out the name of their gang during crimes due to the penalties that are imposed for gang enhancements. The jury was free to credit this testimony. Defendant asserts that the absence of an announcement by

38

defendant suggests that the shooting was done for personal reasons. However, as already stated, the victim testified that he had no personal beef with defendant and there was no evidence to the contrary.

Defendant also asserts that the prosecution's expert's opinion was "based on 'incompetent hearsay under the guise of stating reasons for an opinion' and therefore [was] entitled to no evidentiary weight at all." Defendant, however, is not specific about which parts of the expert's testimony was based on what he deems incompetent hearsay. Moreover, our summary of the evidence supporting the substantive offense and the enhancement on the attempted murder belies this.

c. *Possession of Firearms/Ammunition/Destructive Device*

Defendant contends that there was insufficient evidence to support his convictions for the possession offenses because there was no evidence he had access to the Hill Street residence or those items. We disagree. Defendant certainly had access to the residence on December 17, 2010, and thus, to the items in it. According to a neighbor and even his own girlfriend's testimony, he had access to it on other days as well. Despite his later back peddling, his friend admitted to police and testified at trial that defendant lived there and the friend's back peddling was undermined by the latter's testimony that defendant was never at his parents' house, where his friend claimed he was living, when the police frequently looked for him there. Defendant's girlfriend and the neighbor likewise told the police that defendant lived there. The presence in the home of photographs, Steelers merchandise (which defendant's girlfriend told the police was defendant's) and Christmas gifts bearing defendant's name and the fact that defendant could not be

eliminated as a contributor of the DNA found on the firearms provided further circumstantial evidence of defendant's access to the home and those items, which was neither speculative nor conjectural, as defendant asserts. The girlfriend's denials to the police of any knowledge of the contraband items conflicted with her trial testimony, which was further undermined by her professed ignorance of firearms and how they are used. Unlike defendant, there was no evidence that defendant's girlfriend's son (age unknown), defendant's friend and the friend's brother and his girlfriend, both truck drivers, who frequented the residence, were gang members who would find firearms, ammunition and an incendiary device useful.

### DISPOSITION

The trial court is directed to amend the minutes of September 28, 2012 to strike the reference to defendant committing a third strike. On defendant's indeterminate abstract of judgment, number 6c should be changed to "45 years to life on Count 1" and the first box on number 8 should be checked. On defendant's determinate abstract of judgment, the first and second boxes on number 4 should be checked. In all other respects the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ     
P. J.

We concur:

HOLLENHORST   
J.
KING      
J.